EDWARD C. GRIFFIN et al., Appellants, v. ELLEN NICHOLAS et al.

In Banc, December 21, 1909.

1. **WITNESS: Competency: Other Party Dead: Collateral Contract: Quieting Title.** A contract in issue, within the meaning of section 4652, Revised Statutes 1899, is one in dispute, and as to which there must be a finding, and on which the judgment, in whole or in part, is to rest, or it must be in itself the subject of the cause of action on trial. So that, where plaintiffs bring suit to quiet title, and defendants plead that by a will the common ancestor, who was given a life estate, was given "full power to make such disposition thereof as may be necessary for her own comfort and support," and being in delicate health agreed with them that if they would take care of her she would deed the lots to them, and that in pursuance of that agreement, fully performed, she did execute the deed, the contract between them and her was not in issue and was not the cause of action, and they are not disqualified to testify in proof of the contract, the common ancestor being dead. The plaintiffs are not seeking to have that contract annulled for any cause, nor defendants to have it enforced; it's the deed that is being assailed, and it is the deed that defendants rely upon.

*Held,* by **LAMM, J.,** dissenting, with whom **WOODSON** and **GRAVES, JJ.,** concur, that the validity of the deed rests upon the performance of the contract, and the living party is not competent to testify to its performance, the other party to the deed being dead. The contract is not a collateral one, but directly in issue and on trial. Stam v. Smith, 183 Mo. 464, ought to be disapproved.

2.  —————: —————: ————: —————: ' Admitted by Reply. Besides, it is not necessary to prove the contract, and that defendants performed the services called for by it, specified in the deed as the consideration therefor, where the reply admits those things, and tries to avoid it on the ground of fraud.

3. —————: Equity: Incompetent Evidence Disregarded. On appeal in an equity case the appellate court may disregard illegal evidence and weigh that which is legal; and if the finding is clearly supported by the testimony of competent witnesses, disregarding those who are incompetent to testify, it will be upheld.

4. QUIETING TITLE: Converted Into Equity Case. A suit brought under section 650, Revised Statutes 1899, to quiet title, may by the pleadings subsequent to the petition be converted into a suit in equity to set aside a deed on the grounds of fraud and incapacity of the grantor to convey, and to remove it as a cloud upon the title.

5. WILL: Power to Sell. The will first made provision for the payments of testator's debts, and then said: "I give and bequeath all the balance and residue of my estate to my wife, to have and to hold and enjoy for and during her natural life, with full power to make such disposition thereof as may be necessary for her own comfort and support." *Held,* that the will gave her power, not only to sell and convey her life estate, but also any land in fee simple.

6. FRAUD: Nurses: Confidential Relation. A charge that defendants, to one of whom her sister conveyed the land, were her confidential advisers and nurses and took advantage of her weak and feeble condition of mind and body and thus induced her to make the deed by leading her to believe it was necessary for her comfort and support, within the meaning of her husband's will authorizing her to sell for that purpose, is not met by a showing that, without defendants' knowledge, she began soon after her husband's death and long before the deed was made, to devise means to divest the remaindermen, and her husband's sister and nieces, and divert the property to her sister; and the charge is overcome by a showing that she was not feeble in mind, that defendants were reluctant

to accept her offer, that they sold their own home and moved to hers at her solicitation to take care of her in her distressed condition, and that she acted under the advice and with the assistance of a lawyer of excellent reputation in making the deed.

7. **FRAUD: Power to Sell Upon Condition: Decree of Court for Purchaser's Benefit.** Where the will gave the widow a life estate and power to sell all the real estate "for her own comfort and support," a charge that the condition on which she was authorized to sell did not exist, is not sustained by a showing that she went into court and obtained a decree to sell other lands which a prospective purchaser would not buy until such decree was rendered. That was for the purchaser's benefit, not hers.

8. ————: ————: **Other Property.** Where the will gave the widow power to dispose of the whole property "for her own comfort and support," it is immaterial what she may, without defendants' knowledge, have done with property belonging to the estate other than that deeded to them. Letters to the remaindermen written of her own motion, in which she threatened to spend it, even prodigally, in order that their share might be less, were not competent evidence against the defendants to whom she afterwards deeded property, unquestionably for services rendered her in her distressed and helpless condition. [LAMM, J., dissenting.]

9. ————: ————: **Prodigality.** The fact that the widow, having power to dispose of all the property "for her own comfort and support," frittered away the money that had come into her hands, even if by sale of some of lands, did not prevent her from disposing of the rest of the estate; and if before seeking the aid of defendants she spent the money and thereby made necessary the conveyance to them of the lots in suit, they are not chargeable with her improvident management. The will did not mean that she could sell only what others might regard as necessary for her support and comfort in the exercise of reasonable and prudent economy.

*Held*, by LAMM, J., dissenting, with whom WOODSON and GRAVES, JJ., concur, that the power of disposition, under the will, hinged on the necessity for sale for her own comfort and support, and not on the comfort and support of others, and did not mean that she could by exercising the power given by the will, which excluded her own relatives from sharing in the estate and gave the property in remainder to testator's relatives, defeat its purposes and equalize her relatives with her husband's; and that being her manifest purpose in selling other lands and deeding the lots in suit to her defendant sister, as shown by the con-

Griffin v. Nicholas.

tinuing provision for her support arising from the estate and the use she made of the money derived from the sale of other property, and defendants having knowledge of her purpose and acts, the deed should be set aside.

10. **WILL: Power to Sell: Decree of Court.**  Where the will gives the widow power to sell the property "for her own comfort and support," the power to sell rests in her discretion, and it is not necessary, in order for her to sell, that she be supported by a decree of a court of equity finding that a sale is necessary for her support and comfort.

*Held,* by LAMM, J., dissenting, that whether the contingency actually happened which would uphold a conveyance, is a matter for judicial determination; and the conveyance not being reasonably necessary for her comfort and support, should be set aside at the suit of the remaindermen, for whom in a sense the donee with power of sale was trustee.

11. **DEED: Consideration: Inadequacy: For Services to be Rendered.**  Where the deed, as its consideration, required the grantee and her husband to nurse, care for and minister to the wants and comfort of the grantor, during her life, who was the grantee's sister, and who was an invalid sixty-six years old who had lost the use of her lower limbs, and to be void unless such service was rendered, it will not be set aside at the suit of remaindermen in a will on the ground that the value of the property was in excess of that of the services rendered. The value of such services is not the wages at which a hired servant could be employed, for there was an element of kindness and loving and delicate ministrations that entered into the service that cannot be hired. Besides, the husband knew of her condition when he by his will gave her power to dispose of the property "for her own comfort and use," and that fact is to be considered.

12. ——: **Recording: Validity.**  The withholding of the deed from record, in such case, until after the grantor's death, did not affect its validity.

*Held,* by LAMM, J., that it was evidence of the grantee's knowledge of the grantor's purpose and scheme to divert the property devised in remainder by her husband to his relations, to her own relatives, the defendants, under her power to sell it for her own support.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

AFFIRMED.

*Shannon & Shannon* and *Elvin Swarthout* for appellants.

(1)   The court erred in permitting the defendants, Ellen Nicholas and Thomas R. Nicholas, to testify, the plaintiffs having objected to their testimony on the ground that they were parties to the transaction, or cause of action, in controversy while the other party, Mrs. Burlingame, was dead.  Looker v. Davis, 47 Mo. 145; Angell v. Hester, 64 Mo. 142; Sitton v. Shipp, 65 Mo. 297; Ring v. Jamison, 66 Mo. 424; Hisaw v. Sigler, 68 Mo. 449; Bradley v. West, 68 Mo. 73; Wood v. Mathews, 73 Mo. 477; Hughes v. Isreal, 73 Mo. 538; Meier v. Thieman, 90 Mo. 433; Leeper v. Taylor, 111 Mo. 312; Teats v. Flanders, 118 Mo. 660; Curd v. Brown, 148 Mo. 95; Miller v. Slupsky, 158 Mo. 643; Patton v. Fox, 169 Mo. 97; Smith v. Smith, 201 Mo. 546. (2)   Where the power of sale conferred on a life tenant depends upon a contingency, it can be exercised only upon the happening of the contingency.  Thus under a power to sell in fee simple, and use the proceeds for maintenance and support in case of need, the life tenant does not take an absolute power of sale at his will and pleasure but has merely a power of sale dependent upon the contingency that he should need, and a purchaser from him is bound to ascertain whether the contingency authorizing the sale has happened. 22 Am. and Eng. Ency. Law (2 Ed.), p. 1156; Scheidt v. Crecelius, 94 Mo. 322; Williams v. Berry, 8 How. (U. S.) 495; Hull v. Culver, 34 Conn. 403; Fleming v. Meills, 182 Ill. 464; Warren v. Webb, 68 Me. 133; Larned v. Bridge, 17 Pick. (Mass.) 339; Stevens v. Winship, 1 Pick. (Mass.) 318.   (3) A life estate expressly created will not be converted into a fee, absolute or qualified, or into any other form greater than a life estate, by inference or implication or any language which falls short of a positive provision.  The result will not be attained by reason of there being

coupled with the devise a power of disposition or control, however general and extensive. 30 Am. and Eng. Ency. Law (2 Ed.), p. 750; Bryant v. Christian, 58 Mo. 98; Brant v. Virginia Coal Co., 93 U. S. 326; Sheldon v. Rose, 41 Conn. 381; Lewis and Palmer, 46 Conn. 454; Mansfield v. Sheldon, 67 Conn. 390; Kennedy v. Alexander, 21 App. Cas. (D. C.) 424; Griffiths v. Griffiths, 192 Ill. 632; Baldwin v. Norford, 117 Iowa 72; Glover v. Reid, 80 Mich. 228; Gadd v. Stoner, 113 Mich. 678; Murford v. Dieffenbacker, 54 Mich. 593. (4) The Missouri cases go further and hold that where a devise is made in general terms, and no express limitation to the life of the devisee appears, the addition of an absolute power in the devisee to dispose of the property does not create an estate in fee simple, if the subsequent provisions of the will disclose an intention to give only a life estate to the devisee. McMillan v. Farrow, 141 Mo. 55; Harbison v. James, 90 Mo. 411; Muro v. Collins, 95 Mo. 33; Cross v. Hoch, 149 Mo. 325; Russell v. Eubanks, 84 Mo. 83; Cornwell v. Wulff, 148 Mo. 542; Walton v. Drumatra, 152 Mo. 489. (5) Where a power of disposal accompanies a bequest, or devise, or conveyance of a life estate in property, the power of disposal is only co-extensive with the estate given, unless there are other words indicating that a larger power was intended. 22 Am. and Eng. Ency. Law, p. 1126; Brant v. Coal and Iron Co., 93 U. S. 327; Riggins v. McClellan, 28 Mo. 23; Turner v. Timberlake, 53 Mo. 377; Corby v. Corby, 85 Mo. 382; Gavan v. Allen, 100 Mo. 298; Henderson v. Blackburn, 44 Am. Rep. 780; Miller v. Potterfield, 19 Am. St. Rep. 919; Giles v. Little, 104 U. S. 201. (6) The will devising to his wife ''all the balance and residue of my estate'' ''to have and to hold and enjoy for and during her natural life, with full power to make such disposition thereof as may be necessary for her own comfort and support,'' and providing that ''after the death of my wife, then all of my estate is hereby willed to

Ann Kendrick to have and to hold during her natural life,'' and ''after the death of said Ann Kendrick . . . then all the balance and residue of my estate I hereby will to my nieces,'' etc., should not be construed to confer a power upon the widow to sell the fee of any of the real estate. Munro v. Collins, 95 Mo. 35; Schorr v. Carter, 120 Mo. 412; Smith v. Bell, 6 Pet. (U. S.) 68; Bramell v. Cole, 136 Mo. 210. (7) The words ''remainder'' and ''balance and residue of my estate'' do not imply a power of sale. Munro v. Collins, 95 Mo. 41; Schorr v. Carter, 120 Mo. 409; Bramell v. Cole, 136 Mo. 212. (8) At most this will only confers a life estate with a limited power of sale. 30 Am. and Eng. Ency. Law (2 Ed.), p. 740; In re Mallory's Estate, 127 Mich. 121; Gad v. Stow, 113 Mich. 690; Owen v. Switzer, 51 Mo. 322; Evans v. Folks, 135 Mo. 397; Underwood v. Cave, 176 Mo. 1; Scheidt v. Crecelius, 94 Mo. 322. (9) A third party acquiring by gift or fraud, the property of an estate, from the life tenant, holds the same and the fruits thereof as a trustee for the remaindermen. Johnson v. Johnson, 51 Ohio St. 446; Shibla v. Ely, 2 Halstead (N. J. Ch.) 181. (10) Where the income and the personal property of an estate are sufficient to support the widow, who is given by the will of her husband a life estate with power to dispose of property for her support, a conveyance by her cannot be supported. Minot v. Prescott, 14 Mass. 496; Parks v. American Home Missionary Society, 62 Vt. 19; Murford v. Dieffenbacker, 54 Mich. 593. (11) Where a devisee is given power to dispose of property ''if necessary for her own comfort and support,'' the comfort is equivalent to the word support. Peckham v. Lego, 57 Conn. 553.

*Thomas & Hackney* for respondents.

(1) The trial court did not err in permitting Ellen Nicholas and Thomas Nicholas to testify on the

trial of this cause. "The contract or cause of action in issue and on trial" was not the contract between Mrs. Burlingame and Ellen and Thos. Nicholas nor the deed made in pursuance of that contract. The defendants in their answer alleged and the plaintiffs in their reply admitted the contract and the execution of the deed. No person claiming any right under Mrs. Burlingame is questioning the deed. Her heirs are not parties to this suit. The plaintiffs claim that the deed was made without authority and was fraudulent as to them. The plaintiffs are not seeking to avail themselves of any right secured to Mrs. Burlingame by the deed or the consideration agreed to be paid thereby for the property, but on the contrary are claiming rights antagonistic to the rights claimed and asserted by her under the will and deed. This suit is not upon the contract evidenced by the deed and its recitals, and, hence, that contract in the meaning of the statute is not in issue and on trial. Plaintiffs' rights lie wholly *dehors* that contract and outside of the mutual stipulations of the parties to the contract and deed and depend upon showing that it was made without authority. Stam v. Smith, 183 Mo. 464. But even if Ellen and Thos. Nicholas were not competent witnesses, still the admission of their testimony was harmless error as the contract was admitted by the pleadings and every feature touching its performance was abundantly shown by the testimony of other witnesses. (2) The power to dispose of refers to all of his estate which shall remain after the payment of his debts. Hence, the deed executed by Mrs. Burlingame, January 15, 1903, conveyed the fee simple title to the property in controversy in this suit and not her life estate only. St. L. & V. Ass'n v. Fueller, 182 Mo. 93; Boyer v. Allen, 76 Mo. 500; Pendleton v. Bell, 32 Mo. 100; Jecko v. Kaussig, 45 Mo. 167; Garland v. Smith, 164 Mo. 1; Gavin v. Allen, 100 Mo. 297; Johnson v. Battelle, 125 Mass. 453; Barker v. Clark, 72 N. H. 334;

Swarthout v. Ranier, 143 N. Y. 499; Yetzer v. Brisse, 190 Pa. St. 346; Henhauser v. Decker, 38 N. J. Eq. 426; Bishop v. Remple, 11 Ohio St. 277; Stroud v. Morrow, 7 Jones L. (N. C.) 463; Shaw v. Hussey, 41 Me. 495; Boyer v. Allen, 76 Mo. 500.   (b)   The will in this case on its face shows that it was the intention of the testator that the whole corpus of the property should be disposed of by his wife when necessary for her comfort and support.   (3)   Under the terms of the will the widow had absolute power to dispose by deed of all or any part of the real estate devised to her, when it became necessary to her own comfort and support; and she having found it necessary for her comfort and support, and in good faith, executed the deed to the property in controversy, the same is valid and binding and vested in the defendant the title in fee simple to the same.   Hazel v. Hagan, 47 Mo. 277; Richardson v. Richardson, 80 Me. 585.   (4)   The testator having given his wife all of his property during her natural life and also having given her the power to sell any of said property when necessary for her own comfort and support, she was made the judge as to when it became necessary for her comfort and support; and the defendants herein having acted upon her contract and conveyance and in good faith nursed, cared for and comforted her and provided for her during her lifetime, are purchasers of the property for a valuable consideration, the very highest known to the law, and said conveyance cannot be called in question.   Berg v. Moreau, 199 Mo. 416; Allen v. Herlinger, 219 Pa. 56; Scott v. Scott's Exrs., 2 Bush (Ky.) 147; Paxton v. Bond, 15 S. W. 875; Hosman v. Willett, 107 S. W. 344; Matthews v. Capshaw, 109 Tenn. 480; Bunner v. Storm, 1 Sandf. Ch. 357; 2 Perry on Trusts (4 Ed.), secs. 507, 511; Doran v. Pifer, 164 Pa. St. 430.   (5)   By the terms of the will, the widow had the right to dispose of the property for purposes beyond the mere matter of procuring food, drink and shelter necessary to sustain life and beyond

the matter of procuring a mere dreary hospital life. "Support" would have included these. She was entitled to use the property for the purpose of procuring those things necessary to her comfort as well as support. Forman v. Whitney, 2 Keyes 168; Chambers v. St. Louis, 29 Mo. 576; Anderson's Law Dict., p. 701. For definition of the word "necessary" see Legal Tender cases, 110 U. S. 440; McColloch v. Md., 4 Wheat. (U. S.) 413; Pettingill v. Porter, 8 Allen (Mass.) 6; Crozier v. Hoyt, 97 Ill. 23; Comrs. of Parks v. Moesta, 91 Mich. 153; Sargeant v. LaPlata County, 21 Col. 171. Defendant fully established this necessity by the testimony in the case. Berg v. Moreau, 199 Mo. 416.

VALLIANT, C. J.—The petition in this cause is aimed to come under section 650, Revised Statutes 1899, and prays to have the title to two certain lots in the city of Carthage adjudged and quieted; it states that plaintiffs are the owners of the lots, deriving their title under the will of W. L. Burlingame, deceased; that defendants are in possession and claim title under a deed from Rosanna Burlingame which is a cloud on plaintiffs' title.

The answer of defendants admits that they are in possession and asserts that they hold title under a deed duly executed by Rose (*idem* Rosanna) Burlingame and sets out the terms of the will under which it avers that Mrs. Burlingame had power to make the deed, that is, that the testator by his will gave his whole estate to his wife, Rose Burlingame, for life, with power to sell and dispose of the same for her necessary comfort and support; that Mrs. Burlingame was an invalid requiring very arduous labor and care; that defendant Ellen Nicholas was the sister of Mrs. Burlingame; that the deed was made in consideration that Mrs. Nicholas and her husband would nurse and take care of Mrs. Burlingame during her life, the deed to become void should they fail to do so; that they performed the required

conditions during the life of Mrs. Burlingame and the title thereby became indefeasible. The answer also avers that in 1902 Mrs. Burlingame was brought from her home in Carthage to the home of defendants on their farm in Vernon county, in a very distressed and helpless condition, requiring extraordinary attentions specified; that she remained with them on their farm until September of that year, and begged the defendants to sell their farm and take her back to Carthage and live with and take care of her, nurse and protect her during her life, and proposed to them if they would do so to execute the deed in question; that they did agree to do so, sold their farm, took her back to Carthage and rendered the required service to her during her life. Then the answer goes on to say that after the death of Mrs. Burlingame the defendants made certain valuable and permanent improvements, paid taxes, etc., and if their deed is to be set aside they pray that an account of their improvements, etc., may be taken and the amounts so ascertained be charged as a lien on the property in question.

The reply filed by plaintiffs admits the due execution and recording of the deed, but avers that at the time of its execution Mrs. Burlingame was "sick and feeble in body and mind" and defendants were her confidential advisers and nurses and took advantage of her enfeebled condition and induced her to believe that it was necessary for her to make the deed in order to "provide for her necessary comfort and support," while in truth she was otherwise well provided for and had an income abundantly sufficient for that purpose.

The reply asserts that the clause in the will giving the power to Mrs. Burlingame to sell and dispose of the property was limited to her life estate, that is, that the will meant that she could sell her life estate only. The reply also avers that during the lifetime of Mrs. Burlingame, during a period of about three years and while she was under the care of defendants, she spent about

$6,000 for the support of the defendants and herself; that at her death all her personal property passed into the hands of defendants, and in that way "they have been well and fully paid for nursing and caring for the. said Rose Burlingame." That if defendants have made any improvements the same were paid for out of the estate of W. L. Burlingame, deceased, and plaintiffs had no knowledge of any improvement. "That at and prior to the time the defendants and Rose Burlingame entered into the contract and executed the deed referred to in defendants' cross-bill herein the said Rose Burlingame had sold a large amount of real property belonging to the estate of W. L. Burlingame and that she had realized therefor from $3,000 to $3,500 in cash, and that the remainder of the real property belonging to the estate was rented for about $125 per month, and that at said time said Rose Burlingame was sixty-six years old and that the income from said property and cash aforesaid was more than sufficient to provide for her then existing and prospective wants necessary for her comfort and support." That even if she had the power to sell, it was her duty to have exhausted the rents and cash before doing so and in violating that duty she perpetrated a fraud on the plaintiffs and the defendants participated in the fraud. That the deed was not made in good faith, but to cheat and defraud the plaintiffs. That Ann Kendrick, to whom the will gives a life estate in the property after the death of Mrs. Burlingame, is alive and should be made a party to. the suit. The pleadings are long and full of detail, but their substance is as above stated. The following is a copy of the material part of the will under which both parties claim.

"Second: I give and bequeath all the balance and residue of my estate to my wife, Rosanna Burlingame, to have and to hold and enjoy for and during her natural life, with full power to make such disposition there-

of as may be necessary for her own comfort and support.

"Third: After the death of my wife then all my estate is hereby willed to Ann Kendrick to have and to hold during her natural life, but with no power to sell or dispose of any real estate.

"Fourth: After the death of the said Ann Kendrick or if she shall die before I die, then all the balance and residue of my estate I hereby will to my nieces, Florence Griffin and Birdie Huling.

"Fifth: I hereby name and appoint my wife executrix of this my will, and it is my desire that she be permitted to qualify and administer on my estate without bond."

The plaintiffs are one of the nieces mentioned in the will and an infant child of the other niece who has died since the death of the testator and they sue as remaindermen under the will. Both plaintiffs are residents of Michigan, the infant plaintiff is represented by one Edward C. Griffin who styles himself "guardian and curator duly appointed by the probate court of Kent county, Michigan;" if he has any authority from any court in this state to represent the minor it is not stated in the pleadings.

There was a judgment for defendants declaring the title to the property in question fully vested in defendant Ellen Nicholas; from that judgment the plaintiffs appeal.

Over the objection of plaintiffs the defendants were permitted to testify in proof of the contract alleged in the answer to have been made while Mrs. Burlingame was on defendants' farm in Vernon county, pursuant to which the deed was made, and the acts of defendant in compliance with that contract and the performance of the conditions required by the deed. The objection was that Mrs. Burlingame, one of the parties to the contract, being dead, the other parties are disqualified as witnesses to prove the contract.

Section 4652, Revised Statutes 1899, first removes the common law disability which disqualified a witness on account of his interest in the suit, then it excepts from those whom that statute, without the exception, would render qualified, a party to a contract in issue and on trial when the other party was dead. The language is: "Provided, that in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify in his own favor," etc. A contract in issue within the meaning of the statute is one in dispute and as to which there must be a finding, and on which finding the judgment in whole or in part is to rest or it must be in itself the subject of the cause of action on trial. This contract (we are not speaking now of the deed) was not in issue nor was it the cause of action. The plaintiffs are not seeking to have the contract vacated or set aside for any cause, they are assailing the deed, and defendants are not asking to have the contract enforced or performed; according to their contention it has been fully performed on the part of Mrs. Burlingame by executing the deed, and they are relying on the deed and on the power given her in the will to execute it. If she had power under the will to execute the deed for the consideration therein expressed, the contract made at the farm is immaterial, and if she had not such power that contract could not have given it to her. Besides, the reply admits the contract and seeks to avoid it on the ground that it was unnecessary for her comfort and support. The answer of defendants pleads with detail the contract made at the farm and the deed afterwards executed in pursuance thereof, and the reply says "that at and prior to the time the defendants and the said Rose Burlingame entered into the contract and executed the deed referred to in defendants' cross-bill the said Rose Burlingame had sold a large amount of real

property,'' etc. The contract was a mere inducement or circumstance leading up to the deed. If Mrs. Burlingame had refused to execute the deed she could not by force of that contract have been compelled to do so, because the execution of the deed under the terms of the will rested in her discretion; if she had refused, she might perhaps have been liable to an action for damages as for a breach of the contract, but could not be required to make specific performance of it. If Mrs. Burlingame had refused to make the deed and an action for damages, as for a breach of contract, had been instituted against her or her administrator, then the contract would be in issue and on trial, and if the suit were against her administrator the defendants would be incompetent to testify. But that is not the case. There was really more importance attached to the contract than it deserved; if it bore on any issue in the case it was on the charge of fraud made in plaintiffs' reply. If defendants yielded to persuasion of Mrs. Burlingame, gave up their home, sold their farm at a sacrifice to accept her proposal, it was evidence tending to disprove the charge of fraud, but even in that respect it would have been important only if the plaintiffs had introduced any evidence tending to show fraud committed by these defendants, as to which we will see later.

It is complained, also, that the defendants were permitted to give testimony going to show the extent and character of their services rendered to Mrs. Burlingame as a consideration for the deed. Going back to the pleadings we find that the plaintiffs in their reply admit ''that the said Rose Burlingame signed and acknowledged a deed purporting to convey the real estate in controversy to the defendant, Ellen Nicholas, and that the said deed is recorded in Deed Record 186, page 171, of the records of Jasper County in the Recorder's Office.'' Having specifically admitted the ex-

ecution of the deed the plaintiffs in their reply proceed to attack it on three grounds: first, that the defendants were her confidential advisers and nurses, and took advantage of her weak and feeble condition of mind and body and induced her to execute the deed by encouraging her to believe that it was necessary for her to do so in order to provide for her necessary comfort and support; second, that the will gave her power to dispose only of her life estate; third, that by large sums of money expended by Mrs. Burlingame during her lifetime for her support and that of the defendants, and by her personal property that passed into defendants' hands after her death, the defendants "have been well and fully paid for nursing and caring for said Rose Burlingame," etc. Thus we see the plaintiffs do not attack the deed on the ground that defendants failed to perform the services which it is specified in the deed are to be performed in consideration of the conveyance, and for the failure to perform which the deed was to become void, but on the contrary they admit that defendants nursed and cared for Mrs. Burlingame, but that they have been well paid for it. It was entirely proper to show the condition of Mrs. Burlingame to show the character of the services she required, so as to show a consideration moving her to execute the deed, but it was not necessary under the pleadings to prove that the defendants performed that service, the reply admits it.

Besides, there was entirely sufficient evidence of other witnesses to show that the defendants faithfully did what under the deed they were required to do, and as this is an equity case we can discard illegal evidence if any and weigh that which is legal.

We say this is an equity case, by which we do not wish to be understood as deciding that the statutory proceeding under section 650 is an equity proceeding, on that point we say nothing, but this case, although the petition may have been designed to come under that

section, has by the pleadings subsequent to the petition been converted into a suit in equity to set aside a deed on the grounds of fraud and incapacity to convey and to remove it from the record as a cloud on the plaintiffs' title. Even therefore if defendants were not competent witnesses (which we do not say) their testimony may be entirely cast aside without affecting the merits of the case.

II. The second ground on which the deed is assailed is that the will gave power to Mrs. Burlingame to sell only her life estate if it became necessary for her comfort and support. We do not deem it necessary to consume much time on that point. The language of the will, after first providing for the payment of his debts, is: "I give and bequeath all the balance and residue of my estate to my wife, Rosanna Burlingame, to have and to hold and enjoy for and during her natural life, with full power to make such disposition thereof as may be necessary for her own comfort and support." The word "thereof" means, of that, and the word "that" is a demonstrative pronoun referring to "estate" as its antecedent. The power given is to make such disposition of the estate, that is, all the estate, as may be necessary for her own comfort and support. His wife was the first and chief object of his bounty, he placed all the estate at her disposal "for her own comfort and support," after her came the testator's sister to whom a life estate was given but no power of disposal, and after her came the more remote nieces to take what was left. The purpose to give his wife a life estate after his death is no more clearly expressed than is the purpose to give his sister a life estate after his wife's death, but to the one was given the power of disposal, to the other not. But if the power given to the wife was only to sell her life estate she was no better off with her life estate than the sister was with hers, for either could sell her life estate without

the power given. The words conferring the power would be idle if they only meant that she could sell her life estate. [Boyer v. Allen, 76 Mo. 498.]

III. The remaining grounds on which plaintiffs attack the deed are, first, that the defendants being the confidential advisers and nurses of Mrs. Burlingame and she being feeble in mind and body, they took advantage of her and induced her to execute the deed by encouraging her to believe that it was necessary to do so to provide for her necessary comfort and support, and, second, it was not necessary to convey this property for that purpose because she already had enough money for her comfort and support, hence the deed was a fraud committed by her on plaintiffs, and defendants participated in the fraud.

There is no dispute in the evidence as to the condition of Mrs. Burlingame. It was very distressing and it is unnecessary to say more than that the services she required were not only arduous and unremitting, but of a delicate nature. We gather from the record that she was a lady of refinement and education. There was no direct evidence on that subject, but the general tone of all the witnesses gives that impression and even the letters introduced in evidence by plaintiffs, which we will presently see, show that she was not deficient in mind or education. The evidence shows that her distressing condition existed before her husband's death and that while he lived he, with the assistance of a hired servant, rendered her the services she required. After his death, which occurred in December, 1901, the servant remained several months and then she broke down, declaring her inability longer to render the service required, and at her request in July, 1902, took her to her sister's, Mrs. Nicholas, one of the defendants in this case, who at that time was living with her husband, the other defendant, on his farm in Vernon county. The testimony of Mrs. Jackson, the

servant above mentioned, is to the effect that while Mrs. Burlingame was staying at the farm she and Mrs. Nicholas came to her three times and tried to persuade her to return and renew her service, but she refused because the service was too hard. On one of these visits to her Mrs. Nicholas said that she would not go to take care of Mrs. Burlingame and urged the witness to do so. She heard Mrs. Burlingame say to Mrs. Nicholas that if she would come and take care of her she would give her this property.

There was testimony to the effect that the Nicholas farm was worth $3,500; that they sold it for $2,200, and returned to Carthage with Mrs. Burlingame in September, 1902, and from that time until her death nursed and took care of her; the deed in question was executed January 15, 1903. The deed was written by and executed under the supervision of a reputable lawyer in Carthage who testified that he acted at the request and under the direction of Mrs. Burlingame. It was recorded October 5, 1904. The deed in due form conveys the lots in question to Ellen Nicholas, it recites that it is made in the execution of the power given by the will of W. L. Burlingame, deceased, and it recites the consideration as follows:

"This conveyance is made on the further consideration, that, whereas, the party of the first part is an invalid, having lost the use of her lower limbs, and being unable to walk or to take care of herself in any wise, and has to be cared for and nursed, and has to be taken about the house in her wheel chair, and when necessary for her to get out and get the air and sunshine has to be wheeled about by some person, and, whereas, she is unable to procure the services of any strangers and she desires the service, care and attention of her sister, the party of the second part, and of her sister's husband, Thomas R. Nicholas, and said care nursing, personal attention and service is necessary for her comfort and support: Now, therefore,

the said party of the second part and Thomas R. Nicholas husband of the party of the second part, in consideration of the making and delivery of this conveyance to the party of the second part, hereby agree and bind themselves to constantly from this date, during the life of the party of the first part, to live with, nurse, care for and in every way administer to the care and comfort of the party of the first part, without any charge therefor other than this conveyance. And it is hereby expressly provided that in case said party of the second part and her said husband should abandon the care, attention and service of the party of the first part as above designated, then this conveyance shall be void at the option of the party of the first part.

"But in case the said party of the second part and her said husband, nurses, cares for and administers to the wants and comfort of the party of the first part during her life, then this deed to be and remain in full force and effect. And the party of the second part and her said husband by the acceptance of this conveyance by the party of the second part shall be held and firmly bound by the conditions herein expressed."

At the time of his death Mr. Burlingame owned besides the two lots in controversy, 144 acres of Jasper county land, lot 3 in Fairview Addition, and a half interest in an opera house in Carthage, and he had in bank $1097.11. After the death of Mr. Burlingame the opera house rented for $135 and afterwards for $140 a month, one half of which, less expenses for repairs, was paid to Mrs. Burlingame. There were some improvements made on the opera house which cost about $500, which was deducted from the rents, and there were also from time to time various repairs, the exact items of which the witness who had the business in charge, and who was plaintiffs' witness, did not recollect exactly, but he remembered an item of $60, one of $12 and one of $7.50; he testified that Mrs. Burlin-

game paid her half of the taxes.  The value of the opera house property was $24,000, the Burlingame half $12,000.

There was conflict in the testimony of the witnesses on the subject of the value of the property in suit; the witnesses for defendants estimated it as worth $3,500 to $4,000, those for the plaintiffs from $6,000 to $8,000.

The following letters written by Mrs. Burlingame about two or three months after the death of her husband were read in evidence over the objection of defendants, who objected on the ground that as to them they were mere hearsay.  Plaintiffs appear to attach so much importance to these letters that we copy them in full:

Feb. 18-02.

"Dear Florence and Bertha:

"I am going to ask a favor of you both, and your husbands, which may seem strange to you all.  But Florence you know Aunt Rose well enough to know she will not ask anything that is not right and just, and it will be to both of your good and to your advantage after while.  I want to send you a paper or papers to sign, and I want the signatures of you two girls and your husbands, and I will send them so you can sign them and not know the contents contained within.  Now when you answer this tell me whether you will or not.  Make it plain yes or no, and do as you think best.  If you say yes, I know it will be done, but remember it is optional with you.  I will give you my word and honor it is all right.

"Answer soon,   Yours in haste,
"Aunt Rose."

"Dear Florence and Bertha:

Now as for signing those papers without seeing them, it can't be done and I was aware of it all the time.

It was a freak of mine just to see what you would say. Such a thing would not be lawful, but laying all jokes aside I have some that I would like to have you and your husbands sign, if you will. And now I will tell you what it is and how it was to be. Last May, the 16th, your Uncle Lee made a will, and when he came home to his dinner he was late, and I said to him Lee what kept you so late, and he said Rose don't scold, I had my will made. I said how is it? After we had sat down to the table he told me just how it was and Mrs. Porter, the lady we boarded with, sat there too and heard him tell me how it was. She thought it was so nice in your Uncle Lee to remember his sister and you girls. But after his death I find in the wording of it is so I have to go before the court and swear that it is for my comfort and support, and that takes off the profits. The farm is one thing that I should like to sell. It has not paid repairs and taxes since we have owned it. Lee had two or three trying to sell it before he died. Now his will was this way, or should have been: "Every thing to my beloved wife during her life, after her death the income of the property to my sister Ann. She has no right to dispose of the property in any way. After her death it is to be divided between Florence and Birdie—he should have said Bertha. The old opera house building is what brings in the most of all, and that I shall not dispose of. Am having a new French Plate front put in it now. Lee had made arrangements for it before he died. Now Florence, what I want is to have you and your husband, Bertha and her husband sign the papers that I shall mail to you this afternoon. By so doing I will be under everlasting obligations to you all, and it will be a happy day for all concerned. I was so glad when I read that you were willing. It will save me so much trouble, and Florence, I have all I can bear now. Uncle Lee's death nearly killed me, and then, added to that, having to stay in my wheel chair is not the pleas-

antest thing in the world. But that I have to put up
with. The other through your kindness and Bertha's
and your husband's can be righted, and I am thankful
that you are willing to help make Aunt Rose as happy
as possible the rest of her life. This in much love to
all,

"AUNT ROSE.

"Inclosed find dollar for expenses. Wednesday,
Feb. the 26th, 1902.

"South Lyon St. No. 720, Carthage, Mo.

"P. S. Florence, if your father don't know of this
keep it from him if you can, please.            .

"Inclosed find dollar for expenses. You will have
to go before a Notary Public to sign the papers to make
them lawful.

"P. S. Florence, in your last letter you wondered
how I could give you the piece of music entitled 'Near-
er My God to Thee' when I had given it away. It was
this way: When sister Ellen was here after Lee's
death and burial, when she went home, I sent it home
with her to give to her grand daughter, and she had
not sent it yet to her, and she sent it to you from Neva-
da, and the piece, 'There is Room in my Heart
for Thee,' I had her take home and put with it. The
title was pretty, and I thought maybe the tune would
be pretty, also. I hope there is room in your heart for
me.

.       "ROSE.

"Florence please let Bird read all of my hen
scratching. It is so hard for me to write."

The papers sent with these letters were drafts of
quitclaim deeds to the farm land and the lots in Car-
thage including the lots in suit, but not including the
opera house. Awaiting the return of those papers
Mrs. Burlingame wrote March 15, 1902, as follows:

"Dear Florence:

"It strikes me that it is time those papers were coming back. They have been gone most three weeks. Now use your pleasure about signing them. Do as you think best. I think you regret your offer or you would be more prompt. My troubles seem to come thick and fast. The only brother I have left is laying at the point of death—Brother William that lives at Rich Hill, Mo. There is only three of us left, brother Will, sister Ellen and myself, and if I had the use of my limbs I would be worth more than all of them. My general health was never better. Things look a little dark just at present, but they will come out all right after awhile. I will surprise you all. Hope this will find you all well. Give my love to Bertha. Send the papers back, and write me. You will hear from me again soon. May have something to tell you. Scribbled in a hurry. With love to all.

"ROSE.

"Saturday, March 15th, 1902."

And on March 22 and 24, 1902 she wrote the following letter:

"Carthage, March, 24.

"Well, Florence, I received the paper and the dollar. Many thanks. You wanted to know if I remembered those pretty brown shoes that we gave you when you were with us. Yes, and the thing that we brought to you after Bessie's death, and how we stopped in St. Louis and got things for you, and the satchel you brought your clothes in, and the trunk you took them home in—so full that Uncle Lee could hardly lock it. Then when I asked a favor of you and Bertha, how you granted it. As it has turned out I am sorry that I asked either of you or his sister, for it has hurt me more than anything that ever happened except Lee's death. If I had asked anything detrimental to any

of you it would have been different, but I did not.
But thanks be to God, every thing is all right.  Don't
have to ask any odds of any one.  It was very strange
that your refusal and his sister's were worded just
the same, only you used the word Uncle Lee and she
used the word Brother.  I forget whether she said
Lee or Will.  But aside from that they were worded
just the same.  Some of you must be mind readers.
Well, Florence, enough of this.  Make the most of this
for it will be a long time before you will get another.
I had ordered Uncle Lee a monument.  It was to be
$300.00, but have countermanded it and have ordered
him a Thousand Dollar one.  I know you will be de-
lighted.  I came pretty near forgetting to tell you.

"Now Florence, after your Aunt Ann and myself
are gone you and Bertha will get what is left, but
don't you think for a minute that I will be at all sav-
ing to keep it for either of you after the way you have
treated me.

"Mrs. Rose Burlingame.

"Carthage, March 24.
"Well, this is Monday morning.  I commenced
your letter Saturday, and thought to send it out, but
found I had used all my envelopes, so had to wait until
this morning before sending it.  The Ladies of the
Grace Church Guild are fitting up the church, fresco-
ing the walls, putting down a velvet carpet.  Your un-
worthy friend donated to it liberally, and am going
to give a beautiful brass chandilear in Lee's memory.
It will hang from the center isle.  Am using the money
that I was going to send to your Aunt Ann; but she
won't care.  She likes to see the good work go on.  She
is a good *Christian,* and she won't mind waiting for it.
I thought I would let you know that I am doing a good
work with it.  There may not be just as much left as
there would have been, but no one helped us earn it,
or gave us anything to help us out, and I feel that I

have a right to do as I see fit with it, and am doing so
to my *heart's content.* This is all.

"Farewell."

Shortly after that correspondence Mrs. Burlin-
game instituted a suit in the circuit court of Jasper
county against these plaintiffs and Mrs. Kendrick, re-
maindermen under the will, stating the provisions of
the will and alleging that a sale of the farm land and
of lot 3 in the Fairview Addition was necessary for
her comfort and support and prayed a decree authoriz-
ing the sale, and a decree was rendered as prayed, in
pursuance of which she sold the farm lands and the
lot, realizing $2,592.50 for the farm lands, and a sur-
rey worth $125 for the lot. The evidence shows that
the reason for going into court for this decree was
that the prospective purchaser would not purchase un-
less a court should decree a sale on the ground that it
was necessary for her comfort and support. Those
letters and that suit and the sale were in the early part
of the year 1902 and before Mrs. Burlingame went to
the Vernon county farm to seek the care and attention
she needed from her sister, Mrs. Nicholas. It was in
September, 1902, that the Nicholases attended Mrs.
Burlingame back to Carthage and began their minis-
tration. Until the deed in question was made January,
1903, Mrs. Burlingame paid the household expenses,
and that is all that the evidence shows to sustain the
allegation that she expended $6,000 in supporting her-
self and the defendants; after the execution of the deed
the Nicholases paid the household expenses. During
the lifetime of Mr. Burlingame the family lived in what
the witnesses called the Lyon Street house, and the
widow and the Nicholases lived there until the Spring
of 1903, when the Main Street house, which had up to
that time been rented, became vacant, and they moved
into it and lived there until the death of Mrs. Burlin-
game. But the house was badly out of repair and be-

fore moving into it was repaired with a new roof, etc., and in making the repairs Mrs. Burlingame expended about $1,100.

Defendants introduced in evidence the final settlement of Mrs. Burlingame as executrix of her husband's estate, which showed a balance in her favor of $802.20; it also showed that the amount she paid for the monument referred to in one of the letters was $255. Plaintiffs introduced the will of Mrs. Burlingame, which, after requiring her debts to be paid, was: "I devise and bequeath to my beloved sister Ellen Nicholas all the rest and residue of my property real, personal and mixed, wherever situated." Her estate consisted in her personal belongings, jewelry, etc., and about $500 in money.

Let us now consider the charges of fraud, which the plaintiffs make, in the light of this evidence.

1. First, that the defendants were the confidential advisers and nurses of Mrs. Burlingame and took advantage of her weak, feeble condition of mind and body and thus induced her to make the deed by making her believe that it was necessary to her comfort and support. There is no evidence whatever to sustain that charge unless it be the mere fact that these defendants were the nurses of the invalid and unless for that reason the burden of proving that she was not imposed on is on them. If the burden was on them they have fully discharged it. The evidence shows that Mrs. Burlingame was a helpless invalid in body, but there was no hint from any one that she was weak or feeble in mind, as the reply charges. Plaintiffs themselves negative that idea; in their brief they charge that this was a scheme of Mrs. Burlingame herself, beginning with her letters two months after the death of her husband (of which the defendants had no knowledge) and continuing through her whole administration. In their brief the plaintiffs say: "The evidence seems to be conclusive that Mrs. Burlingame ruthlessly planned to

despoil her husband's relations of their legacies; and it is hardly less certain that these defendants were cognizant of that intent and that they co-operated with Mrs. Burlingame unreservedly in carrying out the same.'' In other words, that it was *her* wicked plan and these defendants helped her execute it.

Again in their brief they say: ''On February 19th, 1902, two months after her husband's death, her purpose to divert the descent of a large share of the estate of her husband from his relatives to her relations begins to manifest itself in tangible form.'' All that was while these defendants were living on their Vernon county farm and before they were solicited to come and take charge of Mrs. Burlingame, and there is no evidence that they knew anything of it. The evidence shows that the defendants were reluctant to give up their home on the farm and devote themselves to the care of the invalid, but at last Mrs. Nicholas yielded to the solicitation of her distressed sister. And the evidence also shows that Mrs. Burlingame acted under the advice and with the assistance of a lawyer of excellent reputation in making this deed, therefore there remains not even a presumption to sustain the charge of fraud made against these defendants growing out of the fact of their relationship as nurses. If the plaintiffs themselves ever really entertained such an idea they have abandoned it in their brief; they make no such point there.

2. What appellants really rely on is that the condition on which Mrs. Burlingame was authorized by the will to sell the property did not exist, that it was not necessary for her comfort and support to make the deed in question, but that she schemed to defraud the plaintiffs by pretending that it was necessary. That charge is double, that is, it asserts the fact that the condition did not exist, and that it was a fraudulent scheme.

If, as appellants contend, the power to sell could

not be exercised until a court of equity had found as a fact that it was necessary for her comfort and support and had decreed the sale, the charge of fraud is merely gratuitous, because in such case, even if she had acted in absolute good faith, the deed would be ineffective. That seems to have been the plaintiffs' original theory, as shown by their petition, wherein they only assert that the deed is a cloud on their title; it was not until after they came to the stage of filing their reply that the idea of fraud appears. If they were held to the rule that a plaintiff's case must be stated in his petition and not in his reply, it would shorten the issues in this case.

So far as the defendants are concerned the evidence does not connect them with a single one of the acts which the plaintiffs think indicate a fraudulent purpose on the part of Mrs. Burlingame; those acts all occurred before the defendants had any connection with the case, and the only complaint the plaintiffs can make of them is that they accepted a deed to property which the plaintiffs say was of greater value than their services; of that we will consider presently. But let us first see what ground there is to charge fraud against Mrs. Burlingame. It seems that soon after the death of her husband she thought it best to sell the 144 acres of land, why we do not know except from one of her letters which the plaintiffs introduced in evidence wherein it is said: "The farm is one thing I would like to sell. It has not paid repairs and taxes since we have owned it. Lee [that is Mr. Burlingame] had two or three trying to sell it before he died." It was an undesirable, unproductive and expensive piece of property. She had a prospective purchaser, but he was afraid of the title, he said that it might devolve on him forty years thereafter to prove that it was necessary for Mrs. Burlingame to sell the land to provide for her comfort and support and he might not be able to do it. It made no difference whether he was right

or wrong in that opinion, it was his opinion and he would not buy until he had a decree of court or the remaindermen's deed. In that emergency Mrs. Burlingame wrote to her nieces asking them to sign the quit-claim deeds, but they refused. Then she went into court as above stated and obtained the decree and consummated the sale. The fact that Mrs. Burlingame went into court to obtain the decree does not signify that either she or her legal adviser thought it was necessary in order to give validity to the title, but she wanted to sell and could not sell until the prospective purchaser was satisfied. It was perhaps foolish in her to have asked the plaintiffs to sign the deed without reading it, as she herself in a subsequent letter said, but what harm was done? In a letter following, the deeds were enclosed and the whole plot (?) was exposed. One can easily understand how a modest woman in her condition would shrink from going into court and making a public record of her infirmities if it could be avoided. She well said in her letter that if they would sign the papers it would be a great accommodation to her. But when they refused her request Mrs. Burlingame wrote the letter of March 22nd and 24th of which appellants in their brief say: "It does not appear when her purpose to squander the estate of her husband was conceived, but it was very clearly manifested by her next letter." That is, the letter of March 22nd and 24th. In that letter she expresses great disappointment and reproaches them with ingratitude; she said: "As it has turned out I am sorry that I asked either of you or his sister, for it has hurt me more than anything that has ever happened except Lee's death." Interpret that letter in the light of the condition of the poor woman, helpless and suffering and being then in the care only of a hired servant. But the great scheme to defraud, according to the brief of appellants, is manifested in that letter in the threat that instead of a $300 monument to her husband, whose bounty they were all

claiming, she was going to erect one to cost $1,000, and furthermore she was going to contribute with the other ladies of the church to which she belonged to the frescoing of its walls and the buying of a velvet carpet, and beyond all that she was going to buy a brass chandelier in Lee's memory to hang in the very middle of the church! What would the dead man have said if his spirit could have returned and witnessed all that extravagance! We must remember that that letter was written when the writer was smarting under what she thought was unkindness. But in point of fact the evidence does not show that she did any of those things. If she contributed to the frescoing of the church or to the buying of the carpet or if she herself bought the chandelier it has not been shown, but it is shown that she paid only $255 for the monument. Her threat that she was not going to be saving for their benefit was only a little feminine arrow that might sting but not wound. But all of that testimony was incompetent as to these defendants and their objection to it ought to have been sustained. As to them it is mere hearsay, it is immaterial what Mrs. Burlingame may have done with other property of which they had no knowledge. Even if before seeking the aid of these defendants she had frittered away the money that had before come into her hands, still these defendants were not chargeable with her improvident management, and the fact that she may have been improvident would not have prevented her disposing of the rest of the estate as might "be necessary for her own comfort and support." The will shows that she was first in her husband's mind, "for her own comfort and support" all the estate was at her disposal. There was no child of theirs to provide for, she was his all. He knew her condition, and the evidence shows that while he lived she did not suffer for the want of a loving nurse, one

who could minister not only to her physical but her mental distress, who could soothe her with kind words, not merely as even the best of hired servants could do, but as only one bound to her with affection. He made his will and died knowing her condition and we must not forget that fact when we are reading the will. Can we imagine that the testator intended that if she did not use what others might regard as reasonable economy and had improvidently wasted the estate, so that there was little more than one half of it left for his nieces, her power to dispose of it would then cease and she must either go to the county poor house or appeal to the charity of his nieces? The plaintiffs' case is not stated in that language, but that is what it means.

Let us pursue the charge of fraud against Mrs. Burlingame further. Appellants in their brief say that whilst the precise date of the conception of the fraud is not fixed, yet it was "very clearly manifested" in the letter of March 22nd and 24th. That was three months after the death of her husband, and before any of the acts complained of, except the execution of the deed in question, were committed. When people lay schemes to defraud do they begin by giving their intended victims notice of what they are going to do? All that this woman did before the execution of the deed in question was done with full notice to the plaintiffs and in open court. In the suit in which the decree authorizing the sale of the farm land and the vacant lot was obtained these plaintiffs were parties defendant. She was executrix of the will and was bound to account in the probate court for every dollar she received belonging to the estate and the presumption is she did so; if she did not, it was the neglect of these plaintiffs, who had a right to contest her final settlement, and who, according to what they now say, knew within two months after the death of her husband that she had fraudulently planned to waste the estate. These defendants had no right to interfere in the ad-

ministration or file exceptions. The defendants produced in evidence the final settlement of Mrs. Burlingame which showed a balance of $802.20 in her favor. The plaintiffs are not assailing that judgment as having been obtained by fraud, it is therefore conclusive on them and carries the conclusive presumption that all those moneys which plaintiffs now say were squandered were accounted for and allowed in the probate court. What the debts of the estate were, or the expenses of last illness and funeral expenses, we do not know, we only know that the only court that had jurisdiction of the administration approved what was done and found a balance of $802.20 in favor of the executrix. If the plaintiffs had sought to except to the final settlement in the probate court they would have had no difficulty in proving that the executrix had received those moneys, because the public records in the county showed them. But we again say that all that evidence should have been excluded because it is not pretended that defendants had any part in it. They are here to defend their own deed and are not concerned with what occurred before they were called into the case.

One more point as bearing on the charge of Mrs. Burlingame's fraud. Mr. Burlingame died in December, 1901; the letters that we have read, the sales of the farm lands, etc., occurred in the spring of 1902, and the contract made by Mrs. Burlingame with these defendants by which she agreed to convey the property to them on the conditions named was made in September, 1902, all before the expiration of one year from the death of the testator.

Plaintiffs in their brief say that "on February 19th, 1902, two months after her husband's death, her purpose to divert the descent of a large share of the estate of her husband from his relatives to her relations begins to manifest itself in tangible form." Not only must we presume that Mrs. Burlingame knew what her legal rights were, but the evidence shows that early

in that year she had the advice of learned counsel and if she planned to divert the property from her husband's relations to her own, she could very much more effectually have accomplished that purpose by going into the probate court and renouncing the will and electing to take one half of the estate, which would have resulted in her getting very much more of the estate than what she got under the will. There is one item, to-wit, the opera house, the half interest in which was worth more than all the rest of the estate at the death of the testator, and that the plaintiffs have taken possession of and sold since the death of Mrs. Burlingame. But it is evident from her conduct that she preferred to show that respect to her husband's will rather than demand what the law would have given her in spite of the will. We refer to this only to show how unjust to Mrs. Burlingame is the charge of fraud to defeat the purpose of her husband's will.

There was testimony on both sides tending to show the market value of the services of a sick nurse and those estimates varied, as in such case we are always to expect, according to the side the witness is on, and so it was as to the value of the property in suit. Those wide variations show how little probative value there is in such testimony. The character of the services to be rendered is more important to be considered than the market value of the hire of a nurse. In making this will his wife was the chief object of the testator's affection, he knew her condition, he knew what she needed "for her own comfort and support," because he himself had ministered to her, he did not in his own lifetime abandon her to the care of a hired servant, but he gave her that kind attention which no money can buy. Every will for its interpretation depends so much, not only on its own language, but also on its own circumstances, that little aid is derived from what courts have said in interpreting other wills. Counsel for appellants rely with confidence on what was said

by the Connecticut Court in Peckham v. Lego, 57 Conn.
553, wherein the testatrix gave to her niece and her
niece's husband "the use and improvement of the re-
mainder of the estate of which I may die possessed,
both real and personal, during their natural lives.
Should it be necessary for their personal comfort to
use any portion of said property, it is my will that they
do so, exercising good judgment and saving as much
of it as possible for the children born to them." It
would be a useless consumption of space to point out
the difference between the intention of the testatrix
in that will and that of the testator in the one we now
have before us. We have taken that case as a sample
of the cases on which appellants rely. On the other
side cases are cited holding that under the terms of
the will herein considered, the power to sell rests in
the discretion of the widow. [Hazel v. Hagan, 47 Mo.
277; Richardson v. Richardson, 80 Me. 585 and others.]

But we do not feel justified in consuming space
to quote from those cases. We have seen no case where-
in it is held that a power such as is here given cannot
be exercised until at the end of a chancery suit it is
decreed that the necessity exists.

If we may consider the spirit which the plaintiffs
have manifested in the prosecution of this suit and
their opinion as to what was necessary for the com-
fort and support of the widow, it is safe to say that
if she had acted on the idea that a decree of court was
necessary to authorize her to make the deed and had
instituted such a suit, it would have been pending at
her death and the power might as well have never been
given. Wills of this kind are not unusual, but they
would be useless or worse than useless, a source of un-
happy strife, if the appellants' theory should be adopt-
ed. We do not mean to say that if she was recklessly
or fraudulently wasting the estate the court could not
interpose to restrain her, but until a showing is made

to justify the chancellor in laying his hands on her the disposal of the property is in her discretion.

The last point we will consider is the contention of appellants that the value of the property conveyed is in excess of that of the services rendered. That point is not to be established by only showing at what wages a hired nurse could be employed. There are some acts which a hired nurse cannot perform or perform so as to give comfort to the person in distress. Mrs. Gamp was perhaps only a character of fiction, yet Dickens's hold on the hearts of his readers is due to the fact that he portrayed his characters true to life. Mrs. Burlingame's afflictions were not only very serious, but were also of a delicate nature, and could not be attended to without mortifying her womanly sensibilities unless the service was rendered by some one who was actuated by more than a mere money consideration. Her husband knew that fact when he made his will, for he had himself ministered to her, and we must keep that in mind when we read the words ''for her own comfort and support.'' Can we for a moment think that he intended that she should go into open court and tell the chancellor the character of the service she needed? There was but one person to whom she could turn to ask not only to render the labor but to render it with love and kindness, that was her sister Mrs. Nicholas. Appellants count the time that elapsed between the date when defendants took charge of Mrs. Burlingame and the date of her death and figure out what it would have cost to have kept one or two servants for that period, but that is no criterion, not only for the reason already given, but also because the consideration expressed in the deed required the services to be rendered not for one or two years but to continue during the period of her life and the deed was to become void if they should fail to do so. No one knew how long she might live or how the burden of attending to her might increase. She was sixty-six years old

and liable to linger ten or fifteen years; sometimes a helpless person lives beyond expectation. If at any time these defendants had become weary of their engagement and had neglected her or deserted her Mrs. Burlingame could have annulled the deed or caused it to be annulled. The lawyer who wrote the deed was careful to have the defendants sign it binding themselves to perform the obligation. We find no fault with the deed on the ground of inadequacy of consideration.

In this connection we note the fact that the deed was not recorded until about a month after the death of Mrs. Burlingame. Why it was withheld from record we do not with certainty know, and no suggestion of a motive is made in the briefs on either side. If Mrs. Burlingame had authority to make the deed the withholding of it from record could not affect its validity; if she did not have such authority, the recording of it could not help it. There is but one inference that the situation suggests to us to be drawn from the fact, and that is that Mrs. Burlingame caused it to be withheld from record so as to enable her more easily to annul it in case the defendants failed to perform their duty to her. There is a clause in the deed to the effect that if the defendants should fail to perform their contract the deed was to become void at the option of Mrs. Burlingame. We attach no particular significance to the point, but mention it only to show that it has not escaped our notice.

In view of the conclusions above expressed it is unnecessary to go into the question of improvements made on the lots by defendants. We find no error in the record of which the plaintiffs can complain.

The judgment is affirmed. *Gantt, Burgess* and *Fox, JJ.,* concur; *Lamm, Woodson* and *Graves, JJ.,* dissent in dissenting opinion by LAMM, J.

## DISSENTING OPINION.

LAMM, J.—The following divisional opinion, handed down in Division No. 1, is refiled as a dissenting one In Banc by LAMM, J., with some changes to fit it for its new use:

Plaintiffs appeal from a decree in Division No. 2 of the Jasper Circuit Court.

The petition was under section 650, Revised Statutes 1899, and had for its purpose to try, ascertain and determine the estate, title and interest of the minor plaintiff, Wallace, and Mrs. Huling, and of the defendants, respectively, in lots 5 and 6, School Addition to the city of Carthage. It counts on the theory that Mrs. Huling and her coplaintiff, out of possession, were the owners in common of said lots, subject to the life estate of one Ann Kendrick, by virtue of the will of W. L. Burlingame, deceased; that defendants are in possession; that defendant, Ellen, claims under a deed made by one Rosanna Burlingame (known in the record as Rose); that such claim is adverse and prejudicial to plaintiffs; and that said deed is a cloud on their title.

By way of answer and cross-bill, the facts of the controversy were more fully developed, as follows: It is charged therein that said lots belonged to W. L. Burlingame; that by his will duly probated he devised them to his wife, Rose (Rosanna), for her life, with full power and authority to dispose of them for "her necessary comfort and support;" that testator died in 1901 leaving Rose surviving him as his widow; that she was a confirmed invalid, the particulars of her infirmities being set forth, and required the care due an infant; that in January or February, 1902, she was brought to defendant's home in Vernon county (a small fruit farm close by Nevada) and was there cared for by them until in September of that year; that it was impossible to secure the services of a stranger to per-

form the duties of nursing and caring for her; that defendant, Ellen, was a sister of Rose and wife of her codefendant, Thomas; that in this condition of things Rose "insisted and begged the defendants to undertake the care, nursing and protection of the said Rose Burlingame during her natural life, and to induce them so to do and to induce them to sell their farm in Vernon county, Missouri, and move to Carthage, Jasper county, agreed, in consideration thereof, to make, execute and deliver" to Ellen a deed to said lots; that defendants agreed to this and in pursuance of such contract sold their farm in Vernon county, came to Carthage, the home of Rose on said lots, and remained there until Rose's death in 1904, and in every way faithfully and fully performed said contract, "at all times waited upon her, nursed her, dressed and undressed her, put her to bed and lifted her out of bed and tended to her necessary wants, administered medicine, wheeled her about the house and out of the house into the air and sunshine from day to day;" that the defendant, Thomas, was compelled to abandon his business in order to carry out said contract, and that both Thomas and Ellen devoted all their time, energy and attention to Rose; that in pursuance of said contract, on the 15th day of January, 1903 (some four months later), Rose executed to Ellen a deed conveying said lots to her absolutely, duly acknowledged and recorded, made by Rose as owner and in execution of a power granted by the will of her said husband for "her necessary comfort and support;" that by said deed the defendants bound themselves from its date to the end of the life of Rose to live with, nurse and care for and in every way administer to her comfort without any charge other than said conveyance; that the said conveyance was made on a good and valid consideration and that the onerous services performed by defendants during the life of Rose plus the expenses of her sickness and funeral and her debts and obligations due at

her death, amounting to a large sum of money, greatly exceeded the value of the real estate conveyed to Ellen; that defendants in good faith made permanent and lasting improvements on the real estate, built an additional dwelling house thereon at a large outlay of money and greatly enhanced its value; that "this was done with the full knowledge of the said plaintiffs and without objection by them and the said plaintiffs permitted the defendants to proceed to make large outlays of money in repairing the buildings on said premises and in erecting the new building on said premises without objection." The prayer of defendants' cross-bill was that the deed from Rose to Ellen be decreed valid and to vest in Ellen the title in fee simple; that plaintiffs be adjudged to have no title and be estopped from hereafter claiming any, etc.

The cross-bill has an alternative prayer to the effect that if the deed from Rose to Ellen be found ineffective to vest the fee simple title in her, then that an account be taken of the value of the services rendered by defendants to Rose during her life and the value of improvements put by defendants on the lots and of all taxes paid and of money outlays by defendants for funeral expenses, debts and obligations of said Rose, and that the amount found by the court to be due on such account be declared a lien on the lots, that they be sold and out of the proceeds defendants be paid the amount so found due.

The merits of the controversy are further developed by the reply, in the nature of an answer to defendants' cross-bill, as follows in substance: Plaintiffs admit the intermarriage of W. L. and Rose Burlingame; that Mr. Burlingame was the owner of the lots in controversy and died in December, 1901, leaving Rose his widow; that she signed and acknowledged a deed purporting to convey the lots to Ellen, which deed is recorded; that at the time Rose signed and acknowledged the deed she was sick in body and mind; that

Ellen and Thomas were her confidential advisers; that they took advantage of her sickness and weak and feeble condition of body and mind and induced her to sign and acknowledge said deed by encouraging her to believe that such act was necessary for her comfort and support, when in truth and in fact she was well provided for and had an income abundantly sufficient for her necessary comforts and support; that under the will of W. L. Burlingame the lots in controversy were given to Rose "for and during her natural life" and that the power to dispose of them, given by the will, was limited to her life estate, for her necessary comforts and support and that other property was bequeathed and devised to Rose by said will with the same power of disposition; that after testator's death defendants, being the confidential advisers and nurses of Rose, managed her business affairs and that a large amount of money was expended by Rose, to-wit, $6,000, for the comforts and support of defendants and for her own support and maintenance during the short period of less than three years she lived after the death of her husband; that all the personal property left by Rose passed into the hands of defendants after her death; that they had been well and fully paid for nursing and caring for her; that if the defendants have made improvements on the property it was done with notice and knowledge of plaintiffs' interests in it and that the same were paid for out of W. L. Burlingame's estate; that if improvements were made by defendants, plaintiffs had no knowledge they were being made and that when made, if at all, the plaintiff, Mrs. Huling, was and still is a married woman, and the minor plaintiff was and now is an infant; that after and prior to the time of the contract and deed referred to in defendants' cross-bill Rose had sold a large amount of real property belonging to the estate of her husband, thereby realizing from $3,000 to $3,500 in cash; that the

remainder of the real property was rented for about $125 per month; that Rose was about sixty-six years old; that said cash and income were more than sufficient to provide for her then existing and prospective wants necessary for her comfort and support; that, even if she had the power under the will to dispose of the real estate in controversy, it was not necessary to do so at the time and never became necessary; that she lay under a duty by virtue of the will of her husband to exhaust said rents and cash before disposing of the lots; that defendants had knowledge and notice of said facts at said time; and that in violating said duty Rose perpetrated a fraud against plaintiffs and defendants participated therein; that said conveyance was not reasonably necessary in order to provide for the comfort and support of Rose; that it was not made and received in good faith for such purpose, but was made and received by the parties thereto for the purpose of cheating and defrauding plaintiffs and other legatees under the will, and that the parties to said deed confederated and conspired together for that purpose; and that defendants are not entitled to have the value of their services in ministering to the comfort and support of Rose and the value of the improvements made charged as a lien on said property. As an additional ground why there should be no such lien decreed, it is alleged that under the will of W. L. Burlingame his sister, Ann Kendrick, now alive, has a life estate in the lots; that she claims such life estate and is not a party to this suit. Plaintiffs, denying all other averments in the cross-bill, allege that the defendants have no equitable interests in the property and they pray the court to decree their deed fraudulent and void.

The chancellor, deeming plaintiffs' petition a bill in equity, dismissed their "bill," and found the issues raised by defendants' cross-bill and plaintiffs' reply and answer thereto in favor of defendants, decreeing

that defendant, Ellen, is the owner in fee-simple of the lots and that plaintiffs have no right, title or claim therein and that they be forever debarred and estopped from claiming any.

The case on the facts is this: W. L. Burlingame and Rose, his wife, had long resided in Carthage. He was over seventy, was not a strong man, but handicapped by the infirmities of age and subject to heart disease. She was born in 1836 and was the rise of sixty-five years when her husband died. For years prior to his death she had little, if any, use of her lower limbs. Lay witnesses speak of them as "paralyzed." Added to this she was of a dropsical turn and weighed about two hundred pounds. Neither did she have, at least during the last years of her life, full use of her hands and arms, but her vital organs seemed sound. The paralysis affected her bowels somewhat. Her condition required an attendant and, up to the time of her husband's death, to-wit, December 18, 1901, he, with a servant (Miss Eicholz), attended to her wants and ran the household establishment, the servant receiving $3 per week. The old couple were childless and lived comfortably in one of their houses on a pension of $24 a month and the rents of Mr. Burlingame's other real property, and saved up money. He owned the lots in controversy, on which were two dwelling houses—one their home, the other rented; also a half interest in an opera house property, consisting of an opera house in an upper story and two or more business rooms below. He owned, besides, a vacant lot in Carthage and several tracts of land in Jasper county, aggregating, say, 144 acres, the latter, however, affording very little net income. As usual in such cases the estimates of witnesses on values of real estate varied, but, we take it, a reasonable estimate of the real estate under all the evidence, would be from $20,000 to $24,000—more likely the latter. In this estimate his half interest in the opera house represents

one-half of said aggregate. There is some confusion in the testimony on his rental income, but as near as we can get at it, it was the rise of $100 per month and this, with an increase, continued after his death. In addition he died owning personal property appraised at $1,472.11. Of that amount $1,097.11 was cash in bank. At his demise he owed a few current debts—the exact amount not disclosed, but they were small. Mrs. Burlingame had no property except her wearing apparel and a bit of jewelry.

In May, 1901, Mr. Burlingame made his will. His wife had relatives but he ignored them altogether in the disposition of his property. He had a sister living, Ann Kendrick, and two nieces, daughters of a deceased sister, Birdie (known as "Bertha") Huling and Florence Griffin, both married women residing at Grand Rapids, Michigan. Ann Kendrick's residence is not shown but we infer she, too, was a non-resident.

Omitting the formal parts of his will, it reads as follows:

"First: It is my will that all my just debts be paid out of my estate as soon as may be after my death.

"Second: I give and bequeath all the balance and residue of my estate to my wife, Rosanna Burlingame, to have and to hold and enjoy *for and during her natural life, with full power to make such disposition thereof as may be necessary for her own comfort and support.*

"Third: After the death of my wife then all my estate is hereby willed to Ann Kendrick to have and to hold during her natural life, but with no power to sell or dispose of any real estate.

"Fourth: After the death of the said Ann Kendrick or if she shall die before I die, then all the balance and residue of my estate I hereby will to my nieces, Florence Griffin and Birdie Huling.

"Fifth: I hereby name and appoint my wife ex-

ecutrix of this my will, and it is my desire that she be permitted to qualify and administer on my estate without bond.''

Mrs. Burlingame qualified as executrix and administered upon the estate. If she made annual settlements they are not disclosed and we have no means of accurately getting at the details of the course of administration. A final settlement, date not shown, was put in by defendants. It takes no account whatever of the appraised value of the personal property, but charges her with cash received, only $557.13, and takes a total credit for outlays of $1,359.33, the items apparently covering funeral expenses and state and county taxes for 1901, expenses of the last sickness, probate fees, a monument, $255, a few small debts due by Mr. Burlingame, and (singularly enough) some repairs made on real estate in 1902, subsequent to testator's death, and the expense of keeping a horse during that same time. The result of this crude and unexplained method of book-keeping was to ostensibly bring the estate in debt to her in a balance of $802.20.

The record shows that she made no renunciation of the will and no election to take otherwise than under it.

Two months after testator's death, *viz.*, on February 18, 1902, she wrote a series of significant letters to the remaindermen, her nieces, which are set forth in the principal opinion.

These letters were admitted over the objections of defendants.

While this correspondence was in progress, or immediately thereafter, a proceeding was brought by Mrs. Burlingame in the circuit court of Jasper county by constructive services against Ann Kendrick, Birdie Huling and Florence Griffin, the object of which was to sell all testator's real estate except the opera house and the lots in controversy, on the theory that such sale was necessary to realize funds for her comfort

and support.  We take it the purpose of this proceeding was to judicially determine that the will granted full power of disposition on a *contingency, to-wit,* that it should be necessary for the widow's comfort and support, and (what is more to the point) that such contingency had happened.  There was testimony that purchasers were shy of assuming the risk of being able to prove, if challenged later, that the contingency had arisen and they asked a judicial determination of the fact for their own protection.  That proceeding ripened into a decree in July, 1902, and, under it, in that month and in October and November of the same year, the widow sold three several tracts to E. S. Williams *et al.* for an express consideration in one deed of $2,800, in another of $270, and in another of $200—the deeds by apt narration referring to the power in the will and to the decree construing that power and adjudging the sale necessary for the comfort and support of the widow.  While the first deed expressed a consideration of $2,800, it seems the net amount realized by her under that particular sale was $2,232.50.  The record is dark in respect to the cause of this difference.  It seems, too, that instead of getting $200 under the last conveyance to Williams *et al.* she got a vehicle valued at $125.  The total sales to Williams *et al.* aggregated, net, $2,718.50.  In addition, in September, 1903, under the same decree, she sold the last remaining tract affected by it to Nelson and Cora Damon for $500, making a total of land sales of $3,218.50 net; or if the express consideration in the deeds be taken, of $3,770.

Going back a little to January, 1903, on the 15th day of that month, about six months after she got her court decree for the sale of the real estate and about two months after she made her last sale to Williams *et al.,* and eight months before she made her last sale under the decree to the Damons, she secretly made a deed to her sister, the defendant Ellen, conveying real

estate not affected by the decree, to-wit, the lots in controversy. She died September 13th, 1904, and this deed was recorded two weeks after her death and is set forth in the principal opinion.

The foregoing conveyance is the one plaintiffs seek to get rid of and defendants seek to sustain. As to the value of the lots conveyed by it, we think that, averaging the evidence of those best qualified to speak, $7,000 would be a just figure. The lots seem well located, having a one-hundred foot front on Main street and run two hundred feet to Lyon. As said, there were two dwelling houses on the property, one fronting on Main and the other on Lyon. They had a rental value of from $50 to, say, $60 per month. Defendant showed that the insurance carried on these houses was $2,800. One of their witnesses, a real estate man, put the ground value at $3,500. Assuming the houses were not over-insured but carried insurance at full value (which latter assumption is very favorable to defendants) we would have a total value by him of $6,300. Another, a hardware man, a close-by neighbor but not qualifying as an expert, put the value at $4,000. Another, a real estate man, put it at $3,500. The defendant Thomas put it at "not over $5,000." Another, not qualifying as an expert, put it at "$5,000 or $6,000." On the other hand, one of plaintiffs' experts put its value at from $8,000 to $9,000; another at $8,000, and another at the same. So that $7,000 could not be much out of the way. From the foregoing figures it appears that between December, 1901, when her husband died, and September, 1904 (two years and nine months), when she died, she sold, ostensibly for her support and comfort, real estate of the value of over $10,000. To this must be added the personal estate entirely absorbed and the rental income of the opera house and one dwelling, such income amounting, as said, to over $100 per month. She had

during that time the use of another dwelling house, as pointed out, paid her husband's few current debts, the expenses of his last sickness and funeral, and erected a monument to his memory.

Other record facts leading up to this astonishing result are these: As hereinbefore stated, failing to get an out-and-out conveyance of practically one-half of the estate from the devisees and remaindermen under her husband's will, including the lots in controversy, in July of 1902, she took her decree empowering her to dispose of four parcels of land for her comfort and support, omitting from that decree the lots in controversy and the opera house property. But that she planned to appropriate also the lots in controversy *absolutely* is shown by the conveyance she asked the remaindermen to make shortly after her husband's death. The purpose she continued to entertain as to these lots is shown by her statement to defendants' witness, Miss Eicholz, to the effect that she wanted her sister Ellen "to have it if she would come and take care of her. She thought she ought to have it." Up to July, 1902, Mrs. Burlingame resided at Carthage in her home with one servant, Miss Eicholz. At that time the burden of taking care of her, unaided, had become too great for the latter. Her health gave way under it and she took Mrs. Burlingame to defendants' home in Vernon county. Miss Eicholz testified that with another's help she could have taken care of her mistress. The record is silent as to any attempt to get such assistance. Mrs. Burlingame remained with defendants in Vernon county until September, 1902.

Over the objection of plaintiffs that, under the statute, defendants were incompetent to testify as to the contract made and transactions between them and Mrs. Burlingame, finally consummated in the deed, and exception saved, they were allowed to testify that a contract was made as alleged in their answer and cross-bill, further to testify as to the con-

dition of Mrs. Burlingame, as to the character and extent of their services, and to the making and delivery of the deed in controversy and their full performance of the contract. Their testimony does not show that part of the contract was that they should either sacrifice or sell their home in Vernon county, but does tend to show that they did sell their small fruit farm there which was well fitted up as a home, at something of a sacrifice. When this sale was made is dark and whether it was before or after they moved to Carthage we do not know. There is no testimony that it was necessary to sell their home, as we see it, or to show it could not have been rented. In September, 1902, they came to Carthage with Mrs. Burlingame and took up their residence with her in one of the dwelling houses on the lots in suit and thereafter lived with her as one family with all that implies. From that time until the deed was made in January, according to their testimony, there was some preliminary arrangement as to household expenses, to the general effect that Mrs. Burlingame furnished the house room and $30 per month towards groceries. She also furnished the coal for the entire winter of 1902-3. After the deed was made, according to their testimony, this allowance for groceries ceased and from that time on they bore the household expenses. We think the testimony fairly shows that while it was not necessary for two people to be constantly in attendance on Mrs. Burlingame, yet it does show that her weight and infirmities were such that on occasions, not infrequent, two people were necessary as attendant nurses, and that defendants were most faithful in such attendance. She had no physician, apparently, and no outlays on that score. It seems that her physical condition became worse toward the end of her life and that, at times, she was irritable and trying. The little business she had seems to have been in receiving rents, so far as disclosed it was done by

herself. While she was a very helpless woman there is no evidence that she could not transact such business, with those who came to see her, with good sense. While defendants as nurses had complete and sole charge of her and were constantly ministering to her, and she, under the arrangement made, was entirely dependent on them for care, it is not shown that they transacted any business for her beyond paying her taxes and bills, fetching and carrying in running errands at her instance. Indeed, she had no other business except legal business and that was in the hands of competent counsel, now representing defendants. About the time she secretly made the deed to her sister, she also made her will making the defendant, Ellen, sole legatee. At her death she had cash on hand, $500; and the appraisement of her estate showed a total valuation of personal property, $931.50—all passing into Ellen's hands. There is evidence that in the summer of 1902, while yet in Vernon county, an attempt was made by Ellen and Mrs. Burlingame to get Miss Eicholz to take the latter back to Carthage and take care of her and that she refused to go because the labor was too severe. Outside of that attempt the record is barren of any evidence tending to show that defendants or anyone else at any time made any attempt or took any thought to employ any other nurses or make any other arrangements than the one made.

It seems the deed to Ellen was delivered at once. It seems, too, that after that deed was delivered Mrs. Burlingame paid all the after taxes on the lots conveyed to Ellen and that an ambitious plan of improving that property was at once put on foot and carried on up to the time of her death. All this, evidently with the consent and connivance of defendants. It is not necessary to go into details showing that after said conveyance, carpets, curtains, sewer connections, special taxes, screens, painting, carpenter work, building material, sodding, etc., all intended to improve the prem-

ises claimed by defendants and devoted to that end, were paid for out of the income of the estate or the amount realized by the sales of other real estate with defendants' acquiescence. On one of the houses on the lots conveyed to defendants, subsequently Rose put permanent betterments to the amount of over $1,100 for their convenience and gain.

After Rose's death defendants built a third house on the lots, they say at an outlay of $2,700. There is no testimony that plaintiffs had any knowledge of the building of this third house before or at the time it was done and it is not contended that any estoppel on that score, as pleaded in defendants' cross-bill, was made out. Defendants had knowledge of the terms of the will, their deed is the product of legal advice, and the record abounds in both direct and inferential proof that they knew where Mrs. Burlingame's money came from and what she was doing with it.

Florence Griffin, one of the remaindermen, died prior to this suit leaving a son, Wallace, a child of seven years, her only heir, who through his guardian joins with Birdie Huling, the other remainderman, as coplaintiff.

In this court it is contended:

(1) That the deed from Rose to Ellen was a proper execution of the power donated by the will and that the contingency contemplated by the second item happened, i. e., that Rose's conveyance was "*necessary* for her own comfort and support."

(2) It is argued, further, that if the deed be ineffective then defendants are entitled to have charged, as a lien against the property conveyed to them, the value of their services and expenses in the support and care of Rose and to this end an account should be taken and decreed. Further, that they are entitled to have charged against the premises the value of the dwelling house built by them since Rose's death.

(3)   It is further argued that Rose could have re-nounced under the will and taken one-half of the estate absolutely by election, *ergo,* the remaindermen are not injured.

(4)   That the letters from Rose to her nieces were incompetent testimony.

*Contra,* appellants argue:

(1)   That the letters were competent.

(2)   That the chancellor erred in admitting the testimony of Ellen and Thomas to establish the con-tract between Rose on one side and them on the other, to show the performance, to show the delivery of the deed, and sustain it.

(3)   That under the will the widow had no power to convey anything but her life estate; that if she had power to convey a fee simple title it arose only upon the happening of the contingency that such conveyance was necessary for her comfort and support; that de-fendants are charged with notice of the limitations on the widow's power in the will; that the court (not the widow) must determine whether the contingency hap-pened; that, on the whole record, the scheme outlined by the contract and conduct of the widow and the de-fendants shows a well-planned effort, finally consum-mated by the deed and the will of Rose, to divert one-half of the estate from the remaindermen and devisees regardless of the intentions of their testator.

On this record can the decree stand? In my opin-ion it ought not, because:

I.   Before determining main propositions on the merits, we will consider a preliminary question, viz.: Were Thomas and Ellen Nicholas competent witnesses to prove the verbal contract with the deceased widow and life tenant, made in the summer of 1902, and the performance of that contract from September of that year to January, 1903, when it was consummated by her deed to Ellen and evidenced by the deed itself? And

were they competent to prove the delivery of that deed and to establish the value and extent of their services under the contract and their full performance of it till her death in order to sustain the deed?

Both sides rely on section 4652, Revised Statutes 1899, relating to witnesses. After abrogating the common law rule that interest in the event of the suit disqualified a witness, it, in a proviso, makes disqualifications of its own—one of them being: "That in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, . . . the other party to such contract or cause of action should not be admitted to testify," etc. Doubtless no section of our statutes has been oftener here for construction. The obvious difficulty in its exposition has caused doubt and perplexity, springing from its general language and broad thought, in applying it to the varying phases of litigated cases; and its judicial history shows that its interpretation has not always been steady and certain. To illustrate: Interspersed through a line of cases cited by appellants' counsel to sustain their contention, we find Ring v. Jamison, 66 Mo. 424—that case was overruled in Wade v. Hardy, 75 Mo. l. c. 401; and Wood v. Matthews, 73 Mo. 477—that case was overruled by the Wade case, *supra;* and Bradley v. West, 68 Mo. 73—that case was overruled by Chapman v. Dougherty, 87 Mo. l. c. 626; and, finally, Curd v. Brown, 148 Mo. 95—that case was overruled in Weiermueller v. Scullin, 203 Mo. l. c. 474. With this array of overruled cases, inadvertently cited, it is fortunate for appellants that the point made by them rests not upon the doctrine of cases thus exploded, but finds countenance in others of unimpaired authority, as we shall see later.

In the exposition of no section of the statute is there more call for use of the just rule of interpretation that the spirit of the statute as well as its letter must be carefully looked to. [Wade v. Hardy, 75 Mo.

l. c. 400 *et seq.;* Orr v. Rode, 101 Mo. l. c. 398 *et seq.;* Chapman v. Dougherty, *supra;* Meier v. Thieman, 90 Mo. 433; Weiermueller v. Scullin, *supra.*]

Keeping that rule in mind, we have held the reason of the exception is well stated by Dr. Wharton to be, "That when there is no mutuality there should not be admissibility; *i. e.,* when the lips of one party to a contract are closed by death, then the other party should not be heard as a witness." [Chapman v. Dougherty, *supra,* l. c. 621.] We take it the key-note to the right doctrine, the touchstone of correct interpretation in respect to the statute in hand, is: First, equality; second, as in the Statute of Frauds and Perjuries, to shut the door on false swearing.

To determine whether the facts of a given case bring it within the reason of the exception, where the case is close, calls for nice discrimination. The language of the statute being, "That in actions where one of the original parties to the contract or cause of action in issue and on trial is dead," what is the contract or cause of action in issue and on trial in the case at bar and who are the original parties to that contract? It has been well held that the party disqualified need not be a party to the suit, but only one of the original parties to the contract which is the subject-matter of the suit. [Meier v. Thieman, *supra.*] It has been soundly ruled that in ejectment (where the cause of action in issue and on trial is, broadly, *title* to the premises in controversy) the "word, title, includes and signifies all the means and documents which evidence and establish the right of plaintiffs to recover in the action," and that where one of the original parties to a deed relied on by plaintiffs as evidencing their title was dead, that as to such deed (it being necessarily in issue) the living party could not testify to deny its validity—for instance, that it had not been delivered, Chapman v. Dougherty, *supra;* nor testify to establish a contract which, if es-

tablished, would defeat ejectment, Hughes v. Israel, 73 Mo. 538; nor testify to establish the contents of a lost deed in ejectment, Messimer v. McCray, 113 Mo. 382. Assuming it good doctrine as so ruled then it follows that no more is the living party a competent witness to sustain the validity of the deed when that step, as here, is a necessary one.

Observe, in the case at bar not only was defendants' deed challenged by the petition and not only did defendants not rest on a general denial but they took the bits in their teeth by way of initiative. By cross-bill they set up that very deed and the contract for support and comfort. They rely on the deed and contract, and on the performance of the contract as a sufficient consideration to support the deed, as a basis for affirmative equitable relief. Plaintiffs joined issue on that cross-bill, and the chancellor gave defendants that affirmative relief.

On the foregoing record, we observe: In Stanton v. Ryan, 41 Mo. 510, surviving partners sued. Defendant set up a special contract with a deceased partner as a defense. Both defendant and the surviving partners were allowed to testify touching the cause of action of plaintiffs, but defendant was not allowed to testify as to the special contract made with the deceased partner which, if validated and enforced, would have defeated plaintiffs' action. Error being assigned on the exclusion of that testimony, this court ruled: "The suit was not instituted on the contract, it was denied that the contract existed; the surviving plaintiff knew nothing about it; and to permit Ryan, by his own testimony, to come in and set up and prove its terms, when Stanton's lips were sealed by death, and could not be there to contradict, qualify or explain his statements, is at war with justice, and certainly not authorized by law."

Such reasoning precisely fits the facts of our case. As a suit under section 650, as in ejectment, is to try

title, rules applicable to ejectment are applied. [Harrison Machine Works v. Bowers, 200 Mo. l. c. 235 *et seq.*] If in ejectment a witness, an original party in a deed in the chain of title relied on, will not be heard to deny the validity of such deed when the other party to it is dead, as held in the Chapman case, *supra,* neither can he be heard to sustain the validity of that deed, especially when its validity rests on the performance of a contract and the performance of it is sought to be proved by the living party. If that be the rule in ejectment, as we have seen it is, then, by like reasoning, arguing from similars to similars, it must be the rule in suits under section 650 to try title. This is so because the mere form of the action, as pointed out in the Chapman case, is immaterial. Rules of evidence ought not to change because the action changes and takes one or another form. So much is self-evident, since neither the reason underlying the statute nor the letter of it connects itself in any way with the *form* of the action, but deals primarily and only with the admissibility of the evidence and the competency of the witness in all cases. Keeping so much in mind, let us illustrate: If Rose Burlingame had died without making the deed in question, but if she had contracted with defendants to make a deed in consideration of the performance of a contract to support, comfort and nurse her during her life and if defendants had sued for the performance of that contract and sought to vest the title out of the devisees under W. L. Burlingame's will and into them on the theory that Rose Burlingame was the donee of a power under the will to subject the absolute title of the lots in controversy to that contract and to such conveyance, would Thomas and Ellen Nicholas have been competent witnesses to prove the contract and the performance of it? We think not, for it has been well and steadily ruled that in specific performance where one of the parties to the contract is dead the other is not a competent witness to testify to the con-

tract, Teats v. Flanders, 118 Mo. 660; nor its perform-
ance, Sitton v. Shipp, 65 Mo. 297; nor is the living
party a competent witness to reform a contract in equi-
ty by supplying a term omitted "by mistake, accident
and oversight," Smith v. Smith, 201 Mo. 533.

To sustain the lower court in admitting the evi-
dence of Thomas and Ellen Nicholas to prove the origi-
nal verbal contract, the sacrifice of their fruit farm,
the execution of the deed and the full performance of
the verbal contract, as well as the contract evidenced
by the deed itself, reliance is put on Stam v. Smith,
183 Mo. 464. That was a creditor's bill to set aside an
alleged fraudulent deed. The debtor died and the gran-
tees in his deed were permitted to testify to sustain the
consideration of the deed and disprove the fraud. On
the theory that there was no controversy between the
grantor (the debtor) or his heirs or administrators, on
one side, and the grantees, on the other, over the con-
sideration, and on the theory that the deed was not
and could not be challenged by the grantor or his heirs,
that the execution of the deed was admitted and that
plaintiffs were asserting no rights under or by virtue
of it, and that the controversy was between living
parties, the competency of grantees to testify was ruled
in so far as they testified to sustain their theory that
there was no fraud. The Stam case ruled on the doc-
trine of some of the following Vermont cases, viz.:
Bank v. Scofield, 39 Vt. 590; Cole v. Shurtleff, 41 Vt.
311; Morse v. Low, 44 Vt. 561; Downs v. Belden, 46 Vt.
674; Banister v. Ovitt, 64 Vt. 580. A study of them
leads me to the conclusion that they do not sustain
Stam v. Smith, and are no authority whatever for the
position taken by respondents' counsel in this case.
Therefore, since no case goes beyond the reason of it,
we hold Stam v. Smith ought not to be followed, be-
cause:

The leading Vermont case is Bank v. Scofield. In
sustaining the competency of certain witnesses, living

parties to a contract, it was ruled that it was not the contract in issue and on trial. To that end it was said: "It is not the contract declared upon; it is not the cause of action which the party is seeking to enforce by this suit; the plaintiff claims nothing under it. *The defendant does not set it up as a substantive ground of claim by way of offset, or otherwise; neither does he set it up as a defense to the plaintiff's right to recover, even; it is not in issue upon the record; it is not a contract between the same parties; and no judgment that can be rendered in this case will conclude the rights of either party under that contract.*" Plainly the issues in Bank v. Scofield have no similarity to those in this case, *ergo,* the law applicable to such state of facts ought not to be applied here.

In Cole v. Shurtleff, *supra,* it was ruled that the contract over which the question of admissibility was raised was merely *incidental* and *collateral* to the contract at issue and on trial and that the living party was competent. It was ruled that the estate of the decedent was in no way affected by the litigation and could suffer no harm, the court saying that, "As the promise relied upon by defendant, was made as between these parties to the action, and neither being dead, the disqualification contemplated by the statute, does not apply." It seems, therefore, that the Cole case is not in point.

In Morse v. Low, *supra,* it was said: "The contract to which Mrs. Low testified was not the one in issue and on trial, but another contract or transaction between herself and the testator, which comes into the case collaterally, and as a fact bearing collaterally upon the contract or cause of action in issue and on trial, has the effect to establish that the contract in issue and on trial, and which the estate of the testator is attempting to enforce, never existed. She does not come within the disqualification of the statute. This is the con-

struction which the court has repeatedly placed upon this statute.''

Downs v. Belden, *supra,* was ruled on the strength of the Scofield, the Low and the Morse cases, and on similar facts. In that case the admitted testimony related solely to a collateral contract and not to the contract at issue and on trial. Banister v. Ovitt, *supra,* followed the Downs case.

We think we are well within the reasoning of the Vermont cases in holding that their doctrine is not applicable to this record. Here the estate of W. L. Burlingame, as represented by the remaindermen and devisees under his will, is directly interested and vitally affected by the contract and deed. The contract between the widow and the Nicholas people and the deed following it are directly in issue and on trial. The widow in making that contract and in executing that deed, as the donee of the power in the will, *pro hac vice,* acted for the estate of W. L. Burlingame and assumed to bind the devisees and remaindermen. The defendants must stand or fall on her right to make that contract and that deed. In what sense, then, is the contract or deed collateral to the issue on trial? She stood in the relation of a trustee of the estate for the benefit of the remaindermen subject to the provisions in the will for her own benefit and defendants contracted with her in that capacity. So that, she being dead, from no point of view are they competent witnesses on their transactions with her in making or performing the contract, or in sustaining that deed.

II. By the second clause of the will the widow was given the estate ''to have and to hold and enjoy for and during her natural life, with full power to make *such disposition thereof* as may be necessary for her own comfort and support.'' In the evolution of one phase of their argument plaintiffs' counsel contend that the will limits the widow to a disposition of her life estate only. It is pointed out that the third clause

relating to the second life-taker, Ann Kendrick, refers to "my estate," and that this expression is used to designate his estate after the death of his wife. Further, that the expression "my estate" is used in the fourth clause of the will in respect to the remaindermen. The argument runs that these expressions indicate testator's intention to be that the whole *corpus* of his estate would be left, after the life estate fell in, to go to the remaindermen. But counsel argue unsoundly, we think, in this behalf. Getting at the intention of the testator from the body of the will, we see that in the third clause he denies to Ann Kendrick, the second life tenant, "the power to sell or dispose of *any* real estate." That means that he denied to her the power he has just given his widow. Did testator intend to deny to Ann Kendrick the power to dispose of her life estate? If the power given the widow refers merely to a life estate then the power denied to Ann Kendrick refers to the same character of estate and she could not dispose of her expectancy. Now the law favors alienability. A life tenant has the right to sell his life estate without express power to do so. Such estates being vendible at law, we think it follows that the power given the widow in this instance was not idle, as it would be if limited to a life estate by construction, but cuts deeper. When testator gave his widow the power to make "such disposition thereof" as may be necessary for her own comfort and support, what did he mean? "Such disposition" of her life estate? No, he was not dealing with a life estate but was adding something. He was dealing with the fee. This view is strengthened by a critical examination of the will and by putting ourselves in the shoes of testator, getting into the family circle and looking at the situation, the needs of the widow, the extent of the estate and the whole environment from his standpoint. There is no tautology, no lifeless words or thought, no exuberance, obscurity,

or looseness in language—to the contrary, it is a model of perspicuity and terseness, evidently the work of counsel learned in the law, simple, plain, direct, using words of pith and using them to the point.   True, his denial to Kendrick of the right to sell "any real estate" was not necessary.   Silence would have done, but denying it tends to accentuate the widow's privilege and doubtless was put in to that end.   Here is an old man and an old faithful and crippled wife, standing in loving relation with each other.   He had a competence and saw the end of his days at hand.   She had nothing.   There were no children to provide for.   He was under an abiding duty to provide for her well, and, responding to that duty, desired his property in the first instance to be used for her comfort and support, when necessary.   If the income and personal estate were sufficient in the unknown vicissitudes of the future, well enough; but if not—what then?   That contingency, well worth while considering, was in his mind and this will answers that question by *adding* to her life estate the power of making a disposition of the fee on its happening.   The books are full of cases where to a life estate is added a power of disposition of the fee.   It is hornbook law that in interpreting a will the intent of the testator is the controlling thing.   Those claiming under wills take subject to that intent, and the intent of this testator, we think, is as indicated. Therefore we agree with what is said by our Brother VALLIANT on that score.

III.  The duty of courts being to enforce wills when their provisions are not repugnant, or in contravention of law, the pole star of will interpretation being the intent of the testator and that intent depending primarily on the language used, and the language in wills being rarely the same, it results that cases, however soundly decided, establish few rules of universal application.   We shall omit excerpts from them.   Each

case must be decided on its own facts.  In this case defendants assert that the contingency happened upon which the widow could dispose of the fee to the lots in controversy.  Who, ultimately, under this will was to decide that fact?  In some cases the intent of the testator, gathered from his language, puts the right of decision solely in the widow and she is given directly or by implication uncontrolled judgment and discretion. But the use of such language in this will is industriously avoided and testator left the power of disposition to hinge upon the existence of a fact, *viz.*, the *necessity* for her own comfort and support, not that she might deem it so or want it so for by-ends.  So, too, the comfort and support within the purview of the testator was her *own* and not that of another.  The comfort and support mentioned did not mean fanciful conceits, whims or extravagances.  The words import a reference to her needs and manner of living.  Whether the contingency actually happened which would uphold the conveyance, became, therefore, a matter of judicial determination upon the evidence.  That evidence has been set forth at such length as to prclude any necessity of repetition, and we announce our conclusion to be that the contingency did not happen, *ergo,* the deed cannot stand.  The facts disclosed lead to the conclusion, first, that though testator had excluded Mrs. Burlingame's relatives from the list of the objects of his bounty, yet the widow determined they should share practically equally with the devisees under the will, and (what is more to the point) effected that very purpose; second, there are unmistakable indications that defendants shared in that illegal purpose.  They are charged with notice of the terms of the will.  The intimate relations between defendants and Mrs. Burlingame under the same roof and at the same fireside, under a common and confidential family arrangement, not only as blood kin but as her chosen, trusted and

only attendants, when viewed in the light of results attained, must be held to show that they willingly participated in her improper hopes and desires and aided the consummation reached. They were bound to inquire as to her right to make the conveyance and are presumed to have inquired. They are charged with knowledge of all facts such inquiry would have disclosed if prosecuted with diligence. Among other things, inquiry would have shown them that it had been deemed necessary by Mrs. Burlingame, by her legal advisers and would-be purchasers, to have a judicial determination of the happening of the contingency in order to support other sales. They must be held to know that such judicial determination was avoided in this instance and a secret deed was taken and kept off the record until her death. It is not going too far to say that an unfavorable conclusion arises on such fact, *to-wit*, that, among them all, they were not willing to hazard an application to a court to sell the lots in controversy under the powers in the will but preferred to take chances, after the event, of being able to satisfy a court of justice that the contingency arose, should the deed be questioned. Let us put a case: Suppose the assailed deed had been shown to the court when the case brought was on trial, is it supposable that with that deed's providing for her full comfort and support to the end of her days the court would have gone on and sequestrated other real estate as *necessary* to her comfort and support?

It is suggested to us that the widow had the right of election. That under such right she could have taken one-half the estate absolutely. It is shrewdly argued that, since what was done amounted to that, the remaindermen are not injured. But the suggestion is specious and will not bear analysis. If she had renounced the will she would have lost her income for life from the other half of the estate. She would have

gained the full right to have disposed of her half by deed or will, at her wish, but she would have lost the right to have disposed of the whole or any part of the other half for her comfort and support. Balancing the value of her election right against her rights under the will she took the will for it, therefore she and those who hold under her are bound by it and cannot piece out their rights by calling to their aid the abandoned right of election.

We do not hold that under her husband's will the widow was compelled to go into court for power to sell. That she went into court in one instance and stayed out in the other we think is of some significance. She had power to sell under the will. But her power was coupled with a limitation and must be based on the existence of a fact, *to wit*, that the sale was reasonably necessary for her comfort and support. We find the fact to the contrary.

Under the will she was trustee of an estate for the remaindermen as well as the donee of powers on her own behalf. In this dual capacity she and Ellen were bound to act with good faith. This, in law, neither did, however tenderly the facts are viewed. That under such circumstances their deed was not operative to convey a fee simple estate is held by many cases found in briefs of learned counsel, but we need cite but one from our own court, Scheidt v. Crecelius, 94 Mo. 322, and one or two from Michigan, Morford v. Dieffenbacker, 54 Mich. 593; Gadd v. Stoner, 113 Mich. 689. Let us put another case: Suppose instead of one half she had appropriated all the real estate to defendants under the cloak of *necessity,* on the facts of this record would such deed also be good and valid?

Great reliance is put by counsel for defendants on Berg v. Moreau, 199 Mo. 416. But that case differs from this in vital particulars. There the contracting party was the owner of the real estate. He was not hampered by limitations on his right to contract. Not

so here, where the contracting party was a life tenant
and her right to pass the fee rests on powers in the
will to be well executed, *i. e.,* in good faith and under
the limitations prescribed. It seems to me that the
better doctrine is that a will couched in terms of the
one at bar contemplates no sale of real estate until
the personalty is exhausted and the income in rents
proves insufficient, and then only to supply a deficiency
—a state of facts absent from this record. There are
cases giving countenance to this view—for example,
Parks v. Missionary Society, 62 Vt. 19; Morford v.
Dieffenbacker, *supra;* In Re Oertle, 34 Minn. 173.

IV. It is argued by counsel for respondents that
the letters from Rose Burlingame to her nieces in
Michigan were not competent testimony under the is-
sues raised by the pleadings. That contention received
no consideration In Division for it was not deemed of
substance. But as the majority opinion In Banc sus-
tains that contention a word or two now is not amiss.
Speaking generally, one of the appellants' charges was
that Rose Burlingame hatched or participated in hatch-
ing a wrongful scheme to divert her husband's estate
from the remaindermen over to her own blood. There-
fore the proof of that allegation was one step in appel-
lants' case. To my mind it is quite difficult to critically
read those letters without seeing they tend to prove
that allegation. I am unable to take the view that their
contents are mere feminine stings which, peradventure,
irritate, tickle or amuse but do not *hurt*. They show
she wanted half the estate placed at her absolute dispo-
sal while at the same time she preserved to herself the
use of the other half. She thought the will was unjust
to her in that particular. In the light of results ob-
tained, it would be toying with the facts of this case,
it seems to me, not to see that she thus early deter-
mined that such half should be diverted from the re-
maindermen and go to her own blood and kin. Is it

anything to the purpose to say that if the proof had stopped there, and if the Nicholas people had not participated in her design, appellants' case would have failed? Appellants did not stop with the first step in the case. They introduced testimony tending to implicate the Nicholas people in Mrs. Burlingame's preconceived and wrongful design. We shall not repeat observations already made in that regard. Fraud may be established by tracing it from results back to its inception, and there are facts in this record which make it vain for the Nicholas people (with the fruits of the fraud in hand) to contend that they did not participate and aid Mrs. Burlingame in such diversion and conversion. The letters were properly in evidence for what they were worth in an investigation of fraud, and in proving one vital element of it.

V. Not unmindful of the doctrine that "a gentleman should not be improved out of his estate," nor of the other rule that bad faith may be so active and gross in cases of the character we are dealing with that the *mala fides* may present an insuperable obstacle to charging services or betterments against the estate, yet we think equity requires, to disentangle the complications of the present case, that a modified rule should be applied here, which we will set forth as directions that should be given to the lower court.

Having reached the conclusion that the decree is inequitable, sundry courses are open, *e. g.*, we could enter a decree here, or reverse and remand with directions to enter a particular decree on the whole case, or reverse and remand with directions that certain questions are closed and others are open. We think the latter course should be taken because the record *data* for an accounting are unsatisfactory and the case was tried on the wrong theory in admitting the testimony of respondents. Their improper testimony is so inextricably woven into the warp and woof of the

record that it would be impossible to dislodge it and state an account that will do equity.

Accordingly, the judgment should be reversed and the cause remanded with the following directions: *First,* to set aside the conveyance from Rose Burlingame to defendants. *Second,* to hear competent evidence on the reasonable value of defendants' services and outlays for the necessary comfort and support of the widow from the day in September, 1902, they began rendering such services, until the day of her death, excluding the sale of the fruit farm in Vernon county and an alleged sacrifice of that farm, and dealing with the comfort and support of the widow in a humane but common sense way, excluding from it mere fanciful conceits and extravagances. *Third.* They should be allowed for an excess (if any) of expenses of her funeral and just debts of hers by them paid, over and above her own property passing to them or either of them by her will, also for taxes, general and special insurance, and any repairs made by them which were necessary to the preservation of the property conveyed by the deed. *Fourth.* On the other hand, they should be charged with the reasonable value of the use of the house in which they lived with the widow during her life, and any rents they received prior to her death from the real estate. Since her death they should be charged to the date of the decree with the reasonable rental value of the property in dispute, including the reasonable rental value of any house on the premises occupied by them, or built by them. They should also be charged with any money or property passing into the hands of them or either of them and belonging to the estate of W. L. Burlingame, and this includes any of such property so received under the will of the widow. *Fifth.* The reasonable cost of the house put upon the lots by defendants should be ascertained and put to the credit of defendants, and if, on a balance struck on the whole matter, there be found anything due de-

fendants or either of them it should be charged as a lien against said lots. *Sixth.* In default of payment of such amount found due within six months of the date of the decree, the lots should be sold to satisfy the the amount of the lien. *Seventh.* Subject to such lien, the title (as against defendants) should be decreed into Birdie Huling and Wallace Merrill Griffin. *Eighth.* Costs to this date to be paid by defendants and those accruing hereafter to follow the final decree as may be equitable.

*Woodson* and *Graves, JJ.,* concur in these views.