A. F. RECTOR, Administrator of Estate of RACHEL A. DENNIS, v. DAVIS N. GOODLOE et al., Appellants.

Division One, April 6, 1923.

1. **CONTRACT: To Share in Business Undertaking: Partnership.** An agreement by two brothers by which they agreed with their sister that the three would combine their efforts and share equally in whatever property the two brothers then had or should subsequently acquire, if made, was a partnership between the three, pure and simple, and whatever property the two brothers acquired during the thirty years that the three worked together under the arrangement was the property of the partnership.

2. ———: ———: ———: **Dissolution.** Where two brothers operating as partners, had agreed to share equally with their sister whatever property they then had or might subsequently acquire, operated under the agreement for thirty years and then dissolved the partnership, an agreement between them that, in the division of the assets, one of them would take certain property absolutely, and the other the remainder under an agreement that he would hold it in trust for himself and said sister, was entirely beyond the scope of the partnership, since it was no concern of the firm what division or disposition was made of its assets upon its dissolution.

3. ———: ———: ———: **Agreement as to Assets.** After the dissolution of a partnership, a division of its assets among the partners is a matter that devolves upon them individually. Where the partnership consisted of two brothers and a sister, the brothers may join in a promise to the sister with respect to the division of the assets, but they can do so only as individuals, and not as a firm.

4. ———: ———: ———: ———:**Delivery of Property to One Partner in Trust for Another: Oral Agreement.** An assumption that a firm of two brothers having dissolved their partnership, and for the purpose of settling with their sister for her services rendered

as housekeeper and in discharge .of their contractual obligations made many years previously that she was to share equally in whatever property they then had or might thereafter acquire, agreed with her that the firm would deliver a certain portion of the partnership property to one of them to be held by. him in trust for her, implies that there were but two parties to the contract, the two brothers on the one side and the sister on the other, and that the contract remained executory until they delivered the property in performance of the agreement, and that until the delivery the property belonged to the brothers; and the evidence in this case does not support such theory. Besides, the suit of the sister for one-half of the lands conveyed by the firm to said brother cannot be maintained on that theory where the trust was not in writing signed by him.

5. ————: **Trust: In Lands.** An agreement by which lands were conveyed to a brother to be held in trust for his sister must be manifested or proved by a writing signed by him.

6. ————: **To Share in Business Undertaking: Compensation for Services: Partnership: Agreement Upon Division on Dissolution: One Partner Dead: Survivors as Witnesses.** At the time of the trial, one brother, a member of the partnership, was dead, and the two survivors, a brother and sister, were permitted to testify that the original contract between the three was that she was to share equally with the brothers in whatever property they then owned or might thereafter acquire, and that, many years afterwards when the partnership was dissolved, the two brothers agreed that, in the division of the joint property, the one now deceased was to receive two-thirds or two shares, one for himself and the other for the sister, and that the sister had agreed with the other brother that two full shares had been set off to her and said deceased brother jointly, in consideration of which she released all claim to the remaining share. *Held,* that, whether the original contract be deemed to have made the sister a partner on an equal footing with the brothers, or merely to have provided compensation for her services, neither the sister nor the surviving brother was competent to so testify in her suit against the administrator and heirs of the deceased brother to establish her claim to one-half the property set off to him. In making the division the interest of each of the three was distinct, separate and adverse to the claims of the other two, and the sister could not testify as to the terms of the contract, because it was the foundation of her cause of action, and the surviving brother was disqualified because he was an original party to the contract and vitally interested in its establishment, for if established he would thereby relieve himself

and his property of all claim by her, at the expense of his deceased brother's estate.

7. ————: **To Hold Property in Trust for Sister: Insufficient Proof.** Two unmarried brothers, with almost no property, began farming in their own names as sole partners. Their unmarried sister kept house for them, and their subsequent conduct showed that they considered themselves under obligation to compensate her for her services. They prospered, acquired valuable farms and much other property, conducted the business in their own names without consulting her, and thirty years later dissolved the partnership, and divided the property between them, and that received by the one now deceased exceeded in value that received by the other by four thousand dollars. When told of the division, she said she wanted her part, and was told by the now deceased brother that she would get that at his death, but she did not claim an equal share in the property or any definite interest; yet it is reasonably certain from the meagre competent evidence that she was given to understand by the two brothers that she would either share in some measure in the property they accumulated, or be otherwise rewarded for her labor incident to its acquisition. In the light of what they did it is manifest that they considered their obligation was to support her and make suitable provision for her in case she survived them, and this obligation the brother now deceased took upon himself. After the division of the property, he gave her Government bonds amounting to $4,500, and by his will bequeathed her one thousand dollars. Deeming this inadequate, she presented a claim against his estate for services rendered, but later withdrew it and brought this action against his heirs to establish a contract that in the division of the partnership properties he had received two-thirds of it, one share for himself and another for her, and had agreed to give her said share. *Held,* that the competent proof does not establish any such agreement.

Appeal from Saline Circuit Court.—*Hon. Samuel Davis,* Judge.

REVERSED.

*R. M. Reynolds, A. R. James, Harvey & Bellamy, Duggins & Duggins, Roy Williams, Lamm, Bohling & Lamm* and *A. B. Hoy* for appellants.

(1)   The decree is erroneous and is unsupported by

any valid testimony, and this is so because: (a) The trust alleged and sought to be proved by parol was not founded on fraud, accident, surprise or mistake. It was, hence, an express trust. (b) An express trust as to real estate cannot be created, manifested or proved except by writing signed by the persons sought to be charged therewith. To sustain both propositions we cite: R. S. 1919, sec. 2263; Woodford v. Stephens, 51 Mo. 443; Hammond v. Cadallader, 29 Mo. 166; 1 Perry on Trusts (2 Ed.) secs. 76, 79, 134, 162; Weiss v. Heitcamp, 127 Mo. 23; Rogers v. Ramey, 137 Mo. 598; Lehey v. Witte, 123 Mo. 207; Mugan v. Wheeler, 241 Mo. 376; Grindling v. Reyhl, 15 L. R. A. (N. S.) 466; Bender v. Bender, 220 S. W. 929; Lafayette Street Church v. Norton, 39 L. R. A. (N. S.) 906, note; Ferguson v. Robinson, 167 S. W. 447; Curd v. Brown, 148 Mo. 82; Hillman v. Allen, 145 Mo. 638; Peacock v. Nelson, 50 Mo. 256; Mansur v. Willard, 57 Mo. 347; Hunter v. Briggs, 254 Mo. 28; Thompson v. Thompson, 211 S. W. 52; Crawley v. Crafton, 193 Mo. 431; Allen v. Jessup, 192 S. W. 720; Heil v. Heil, 184 Mo. 665; 26 R. C. L. 1202, sec. 41. (2) We admit that Sec. 2263, R. S. 1919, applies alone to real estate and that a trust in personal property may be created and proved by parol. Northrup v. Burge, 255 Mo. 654; Carroll v. Woods, 132 Mo. App. 501; Pitts v. Weakley, 155 Mo. 135. But respondent's case does not prosper on the foregoing pospositions, because: (a) To establish a trust for judicial purposes in either personal property or real estate the evidence must be so clear, cogent, strong, unequivocal, definite and positive as to leave no room for doubt in the mind of the chancellor. Forrester v. Scoville, 51 Mo. 269; Ringo v. Richardson, 53 Mo. 385; McFarland v. LaForce, 119 Mo. 585; Reed v. Painter, 129 Mo. 674; Curd v. Brown, 148 Mo. 82; Brinkman v. Sunken, 174 Mo. 709; McKee v. Higbee, 180 Mo. 300; Reed v. Sperry, 193 Mo. 167; Smith v. Smith, 201 Mo. 547; Easter v. Easter, 246 Mo. 409; Ferguson v. Robinson, 258 Mo. 113; Davis v. Cummins, 195 S. W. 754; Thompson v. Pinnell, 199 S. W. 1014; Johnson v. Jameson, 209 S. W. 924. (b)

The terms of the alleged trust (whether it was created by the alleged original agreement of 1880, or the division agreement of 1911, or both) stood alone on the testimony of John Austin Dennis and Rachel Dennis, and their testimony, even if admissible, which we deny, in no sense reached the requisite high standard of quality and character called for in the authorities cited in subdivision "a" under this head.
(3)   The court erred in admitting testimony on behalf of respondent.   Davis P. Dennis being dead, neither John Austin Dennis nor Rachel A. Dennis were competent to testify (as they were permitted to do over our objections) to the terms of the alleged contract in 1880 or the division contract of 1911.   R. S. 1919, sec. 5410; Meier v. Thieman, 90 Mo. 433; Allen v. Jessup, 192 S. W. 720; Angell v. Hester, 64 Mo. 142; Taylor v. George, 176 Mo. App. 215; Edmonds v. Scharff, 279 Mo. 78; Leiber v. Leiber, 239 Mo. 1; Ham L. & Z. Co. v. Lead Co., 251 Mo. 721.   Prior to the amendment of Sec. 5410, R. S. 1919, to-wit, March 16, 1887, it was held that under the provision of said section, as it then stood, disqualifying one from testifying in his own favor in any case where the other original party to the contract or cause of action in issue and on trial was dead (whether the witness was a party to the record or not), if his testimony was beneficial to the witness, he was disqualified.   Meier v. Thieman, 90 Mo. 433; Thieman v. Meier, 25 Mo. App. 306; Bank v. Hunt, 25 Mo. App. 170; Building Assn. v. Kleinhoffer, 40 Mo. App. 388. The amendment of March 16, 1887, rendered John Austin Dennis incompetent as a witness, not only in his own favor, but in favor of Rachael, who claimed under him. Laws 1887, 287; Sec. 5410, R. S. 1919; Weiermueller v. Scullin, 203 Mo. 470; Lieber v. Lieber, 239 Mo. 19, 20.
(4)   It is a favorite doctrine of the law that the reason of the law is the life of the law and that when the reason of the law fails the law ceases.   Courts have been fond of remarking on the difficulty of applying the statute now in hand so as to work out a right result in each particular case; and in no class of cases is the reason of the

law more diligently sought after than in those cases asking for an application of the statute on witnesses. In the instant case there could be no greater mistake made than to consider John Austin Dennis as on one side of a contract and Rachael Dennis on the other. We admit that if there was nothing in the case but that proposition, then the death of Davis Dennis would not disqualify Austin Dennis as a witness. A long line of cases so hold, beginning with an early case. Fulkerson v. Thornton, 68 Mo. 468. But the two contracts in question are no such contracts. In the 1880 contract, under the testimony of John and Rachael, John first contracts with Davis, his brother, to the effect that they would make a proposition to Rachael and on the terms of the contract they would propose to her. The two brothers then contract with their sister. This was a tripartite contract with three corners to it. The same process was gone through within the division contract of 1911. The brothers first contract with each other as to the terms of the division. They next approach their sister, speaking through John, and they contract with her to accept these terms. In all this John was individually interested in favor of the sister in sustaining this division, for the very obvious reason that it relieved John from the burden of the original contract and substituted Davis in his shoes. In this case the two live parties, Rachael and John, unite their fortunes and jointly testify against Davis, who is dead. (5) On close analysis it becomes plain that the gist of the case is to specifically perform the contract of 1911. Respondents must therefore bring themselves within the established equitable rules regulating specific performance. The Statute of Frauds is not pleaded specifically in the answers, but where there is a general denial, as here, it is not necessary to plead the Statute of Frauds in order to invoke it. Lessley Bros. v. Fruit Co., 165 Mo. App. 201. The equitable rules governing the remedy of specific performance are well known. Thus, 1. The conversation relied upon as proof of the contract should not be too ancient, loose

or casual. 2. The contract should be fair, and just, not an unconscionable bargain. 3. The terms of the contract should be so clear and definite as to free it from ambiguity. 4. The proof should show that the very contract counted on in the bill was made. 5. Performance must be shown as far as practical and the act relied on to show it must be unequivocal, that is, referable alone, to the very contract sought to be performed. 6. And a mere testamentary disposition to devise by will or a mere benevolent disposition to convey by deed by way of gift or reward for services not plainly provoked by and bottomed on the contract in suit will not take the case out of the statute. Forrister v. Sullivan, 231 Mo. 373; Woodard v. Stowell, 222 S. W. 820. The proof must leave no reasonable doubt that the contract was made. McCune v. Graves, 273 Mo. 589. The proof in this case on behalf of respondent, even if the court should consider the oral testimony of John and Rachael in this behalf, does not measure up to the high standard required by the foregoing accepted rules, hence the decree should be reversed on this ground also.

*A. F. Rector* and *Sebree & Sebree* for respondent.

(1) The contract of 1880 is valid and will be enforced in equity. Alexander v. Alexander, 150 Mo. 579; McQuitty v. Wilhite, 247 Mo. 163; McGinnis v. McGinnis, 274 Mo. 297; Lambert v. Railroad, 212 Mo. 720; Walsh v. Walsh, 285 Mo. 181, 211; Bless v. Jenkins, 129 Mo. 339. (2) The division of the property in 1911 was an amicable partition with a view of dissolving the partnership. No new title passed by the deeds. Adams v. Carey, 226 S. W. (Mo.) 833; Powell v. Powell, 267 Mo. 117; Whitsett v. Wamack, 159 Mo. 23; Palmer v. Alexander, 162 Mo. 127. (3) In cases of the character here the Statute of Frauds and in relation to Express Trusts do not govern. Bryan v. McCaskill, 284 Mo. 602; Condit v. Maxwell, 142 Mo. 266; Sutton v. Haydon, 62 Mo. 101; Gupton v. Gupton, 47 Mo. 37; Laughlin v. Laughlin, 237

S. W. (Mo.) 1024; Leahy v. Witte, 123 Mo. 207; Slowey v. McMurray, 27 Mo. 118; Richardson v. Champion, 143 Mo. 538; Browne on Statute of Frauds, 96a; Larrick v. Heathman, 231 S. W. (Mo.) 975; Phillips v. Hardenburg, 181 Mo. 463. (4)   John Austin Dennis and Rachel Dennis were competent witnesses.   Fulkerson v. Thornton, 68 Mo. 468; Vandergrif. v. Swinney, 158 Mo. 527; Williams v. Perkins, 83 Mo. 379; State v. Wooley, 215 Mo. 685; Short v. Thomas, 178 Mo. App. 413; Birdsall v. Coon, 157 Mo. App. 448; Banking Co. v. Loomis, 140 Mo. App. 74; Denny v. Brown, 193 S. W. 552; Elsea v. Smith, 273 Mo. 396, 407; Kinlen v. Railroad, 216 Mo. 174.  (a) Appellant's objection to the competency of John Austin Dennis on the ground of interest was made for the first time in this court, and would therefore not be allowable, even if such objection were good, which respondents deny. Bragg v. Railway, 192 Mo. 342; St. Louis v. Railroad, 248 Mo. 25.  The objections in the lower court were that Davis P. Dennis was dead and that John Austin Dennis was a party to the contract; but there was no suggestion that he was incompetent because of any interest he had in the case, or that the contract was tripartite.   In arguing that John Austin Dennis was incompetent to testify to the division in 1911, the appellants' counsel admit the contract of 1880.  Also the appellants' counsel admit in their brief that if John Austin Dennis was on one side of the contract and Rachel on the other, he was a competent witness.  (b) See Denny v. Brown, 193 S. W. (Mo.) 552, where there was a will in general terms as to property, as in the case at bar.  Denny v. Brown, 193 S. W. 552; Banking Company v. Loomis, 140 Mo. App. 74; Elsea v. Smith, 273 Mo. 407; Kinlen v. Railroad, 216 Mo. 174.

RAGLAND, J.—This action seems to be one to have declared and enforced a trust in real and personal property.  It was originally brought by Rachel Dennis against the executor of the will of Davis P. Dennis, deceased; the

administrator, appointed pending a contest of his will; and his heirs, devisees and legatees.

In 1868, Davis P. Dennis and John Austin Dennis, then young men, came with their father, mother and three grown sisters from Kentucky and settled on a farm, which they rented, in Saline County. The only means possessed by the family was the wagon in which they came, two good teams and thirty dollars in money, all of which belonged to the two boys. Davis and Austin, as they were known, assuming the burden of supporting the family, immediately engaged in farming, operating together as partners under the name of Dennis Brothers. Two or three years later the family was further increased by the addition of four dependent children, the children of a deceased sister who had then recently died in Kentucky. The death of their mother occurred in January, 1880, and that of the oldest sister within three weeks thereafter. The father it seems had died before that time. Presently the youngest sister who had been mentally afflicted for some years, was sent to one of the state hospitals for the insane, where she was kept thirteen or fourteen years—the remainder of her life. After these decimations the family consisted of the two brothers, their sister Rachel and the four children then in their early teens. Rachel at that time took upon herself the burden that ordinarily devolves upon the woman who is at the head of a domestic establishment on a farm —keeping house, mothering children and producing and marketing butter, eggs and poultry. These duties, with the exception of those pertaining to the children who left as fast as they reached an age at which they could maintain themselves, she continued to discharge until her brothers dissolved their partnership in 1911.

By 1879 Dennis Brothers had prospered sufficiently to enable them to buy 180 acres of land for which they paid $2800. At the time of their mother's death they owned this land, several teams, some live stock and an adequqate equipment of farm implements and machinery. But they were in debt some. In the same year, 1880, they

bought for $600 twenty acres adjoining the 180 previously purchased. In 1881 they secure 155 more, paying therefor $3500. At a cost of $6,000 they built a commodious dwelling house on the last mentioned tract in 1884 and moved into it. Austin Dennis married in 1890, he brought his wife to the home of himself, his brother and sister; they all continued as one family until 1897, when Austin and his wife moved to the 200-acre farm, consisting of the first purchases of 180 acres and 20 acres, a few miles away. Dennis Brothers, however, continued in the operation of the two farms until 1911. In July of that year the brothers dissolved their partnership and divided the assets between them. In the division the 200-acre farm fell to Austin, and the 235-acre farm to Davis, and suitable conveyances passed between them. According to Austin, who was living at the time of the trial, for the purposes of the division they valued the farms at the original cost of the land plus that of the improvements. On this basis the value of the 200 acres was $5,000, and that of the 235 acres $13,500. Austin further testified that they divided the money, notes and bank stock equally, or nearly so, he getting $7400 in face value and Davis $7600; that Davis got 50 or 55 head of cattle more than he did, amounting to about $3375; and that no value was placed on the horses, mules and hogs that were divided. In this connection it should be said that at the time of the division of the lands, according to evidence offered by defendant which was not contradicted, there was practically no difference between the two farms as to value, but if anything the 200 acres was on the whole the more desirable farm.

After the dissolution of the partnership of Dennis Brothers, Rachel Dennis and her brother, Davis, continued to live together at the old home until his death, which occurred in 1918. At the time of the dissolution she was 65 years old and he 76; he died at the age of 83.

The foregoing general outline of the facts will aid in reaching a proper understanding of the issues made by the pleadings.

The following portions of the petition sufficiently disclose the cause of action on which a recovery is sought:

"That in or about the said month of January, 1880, and upon the death of the said mother and sister, Emily J. Dennis, the said Dennis Brothers made and entered into a contract with the plaintiff whereby plaintiff agreed that she would live in the home of the said Dennis Brothers and assume the responsibilities and perform the work of the housekeeper thereof, and give the necessary care and attention to the said invalid sister Catherine, and to the said nephews and nieces. For and in consideration of the said promise and agreement of the plaintiff the said Dennis Brothers promised and agreed with the plaintiff that the plaintiff should have and own, and that they would convey and assign to her a one-third interest in and to the real estate and personal property hereinbefore described and mentioned, which was owned and possessed by the said Dennis Brothers at said time, and that the plaintiff should have and own, and that they would convey and assign to her, a one-third interest in all the property to be hereafter acquired and possessed by the said Dennis Brothers. . . . .

"The plaintiff further states that the said co-partnership still existed and that the said contract with the plaintiff was still in force on the eighth day of July, 1911, at which time a dissolution of said partnership and a settlement of its affairs was decided upon by the said partners, and for that purpose, and in consideration and in pursuance of the said contract made by said co-partnership with the plaintiff in January, 1880, the said firm of Dennis Brothers, on or about July 8, 1911, agreed and contracted with the plaintiff upon a division of the property then held and possessed by said firm, by which one-third thereof in value should be conveyed and assigned to the said John Austin Dennis as his share and proportion of said property, and two-thirds thereof in value should be conveyed and assigned to the said Davis P. Dennis, as his and the plaintiff's shares and interests in said property, and that an undivided half interest in

the property so to be conveyed and assigned to the said Davis P. Dennis to be held by him for himself, and the other undivided half interest thereof should be held by him as trustee for the plaintiff and to be thereafter conveyed and assigned by him to the plaintiff, and that the plaintiff and said Davis P. Dennis should continue to live upon the two-hundred-and-thirty-five-acre farm hereinafter mentioned, and farm and conduct the same together, and that the plaintiff should also have a joint half interest in all additional personal property acquired in operating said farm or from the use or accumulations to said personal property so to be assigned to said Davis P. Dennis by said co-partnership.  .  .  .

"That in pursuance of said conclusion for dissolution and of said agreement for the division and partition of said property, the said property then held by said firm was, on or about July 8, 1911, divided as follows: the one hundred and eighty acres and twenty acres aforesaid, and a part of said personal property, was conveyed and assigned to the said John Austin Dennis, as his share, and two hundred and thirty-five acres of land, more or less,  .  .  .  and the balance of the said personal property was conveyed and assigned to the said Davis P. Dennis upon his agreement and promise, and the said agreement and promise of the said firm to the plaintiff that the said Davis P. Dennis would hold the said property so conveyed and assigned to him for himself and as trustee for the plaintiff, jointly in equal parts, and that he would convey and assign to the plaintiff, her one-half interest in said real estate and personal property which was conveyed and assigned to him, in trust, for the plaintiff as aforesaid.

"That at the time of the death of the said Davis P. Dennis, there was held and possessed by him the said two hundred and thirty-five acres of land and certain personal property, a one-half interest in which said real estate and personal property the said Davis P. Dennis held as trustee for the plaintiff; that  .  .  .  said personal property was taken over by the defendants, the

executors and administrators of the estate of said Davis P. Dennis, deceased, and has been converted into money by them and about twenty-thousand dollars of which is now held by the defendant, Barnhill as administrator.''

The prayer was for a decree that, ''at the time of the death of said Davis P. Dennis, he held an undivided one-half interest in and to the said real estate, of which he died seized, and a one-half interest in the said personal property, the proceeds of which are held by the said defendant, Barnhill, administrator as aforesaid, as trustee for the use and benefit of the plaintiff, . . . and that said one-half interest in said real estate be conveyed to her, and one-half interest in said personal property be assigned and paid to her, and for such other and further judgments,'' etc.

The allegations of the petition were put in issue by the answers of the several defendants.

The only substantial evidence offered in support of the two agreements alleged to have been entered into was the testimony of Austin Dennis and that of Rachel Dennis. With reference to the first agreement Austin testified:

''Well, brother and me was there just alone with her and them children, we had no one to housekeep for us or to stay with us, only her, and we just made a contract with her [Rachel] to stay there and run the house part and do what she could in raising them children, and we would stay together and work together and share together what we made, if we made anything, and if we didn't we would get a living maybe. We didn't have nothing to divide up if we divided it worth while. . . . Well, we would give her a full share equal with us, whatever it was, if we had anything, and if we didn't she would just share as we would. . . . Well, if we were successful in making anything, she would get her part, and if we didn't she wouldn't have anything like we would. . . . Never was no change made [in the arrangement] up until 1911.''

The following excerpts from the testimony of Rachel

298 Mo.—18

Dennis contain all that she testified to with reference to the first agreement.

"Q. What conversation, if any, did you have with Davis P. Dennis and Austin Dennis, your brothers, about how you would live there and what arrangement you would have after that· A. Well, we would stay together just as we had lived, we would share alike, we would be alike, all share just as they did.

"Q. And what were you to do? A. Well, I was to keep house for them. . . .

"Q. When they were both present; tell when they were both present. A. Well, they was both present, for we was left there, for our mother had died and our sister and we was there, just left there, and my sister that was afflicted was, and we concluded just to stay together and do the best we could.

"Q. Now, after you made this arrangement that you talk about, what did you do? A. Well, I just done general housework and any kind of work that I could do to keep up everything."

With respect to the second contract pleaded, Austin testified, that he and Davis concluded to dissolve the partnership and divide the property in 1911; that inasmuch as Rachel had always remained with Davis and was then living with him their shares, it was agreed, should be set off together; in other words, that Austin should be given one-third of the assets and Davis two-thirds—one for himself and one for Rachel; and that the division was made on that basis. Austin further said in effect that before finally reaching an agreement he and Davis talked the matter over from time to time during a period of three or four weeks; that some of these conversations took place in Rachel's presence and some did not and that she had no part in the preliminary negotiations or in making the division but that she was "knowing to it."

The substance of Rachel's testimony with reference to the agreement for a division of the property was, that she understood from her brothers that her share and

that of Davis were to be set off together—that one-half of whatever Davis got would be hers.

There were two other bits of testimony bearing on the second agreement: Walter A. Dennis, a son of Austin, said that he was present at the time the deeds were made effecting a division of the land; that his mother was hesitating about signing the deed from his father to Davis, because she thought the latter was getting an advantage; that his father thereupon said to her "that she understood how it was, it was for Davis P. Dennis and Rachel Dennis also, and Davis P. Dennis said, 'Yes, that is right.'"

According to another witness, Ivy May Druell, she heard at one time a brief conversation between Davis Dennis and Rachel: He said, "Well, we have divided things and everything is fixed up;" Rachel said, "Well, I am glad of it, and I want my part," and he replied, "Well, you will get that at my death." That was all that the witness heard said by either of them with reference to the division of the property.

Just before his death Davis Dennis gave Rachel $4170 in Government bonds and by his will bequeathed her $1,000. A contest of the will is now pending. [Gott v. Dennis, 296 Mo. 66.] Early in life he married a neighbor girl and deserted her after a month. A daughter born of this marriage survived him; she is the contestant in the suit just referred to.

At the time of the trial all the personal property of the estate had been converted into money; the debts had been paid and the remainder, approximately $19,000, was waiting upon the determination of the will contest and this proceeding for final distribution.

The trial court adjudged that one-half of the property of David Dennis, both real and personal, was held by him in trust for Rachel, and decreed a conveyance of an undivided one-half interest in the real estate to her and also the payment of half of the proceeds of the personal property in the hands of the administrator, less

one-half of the amount that had been invested in Government bonds for her.

From such decree defendants appealed.

Soon after the appeal was granted, the plaintiff and respondent, Rachel Dennis, died testate. Austin Dennis and his son, Walter A., were the sole beneficiaries under her will. Shortly after the death of Rachel that of Austin occurred. Thereafter the cause was revived in the names of his administrator and heirs, including Walter A. Dennis, who now appear here as respondents.

For reversal appellants reply chiefly on two grounds: (1) Austin Dennis and Rachel Dennis were each incompetent to testify as to the terms of the alleged contract of division made in 1911; and (2) the evidence as a whole, with or without their testimony, is not sufficient to support the finding and judgment.

I. It is evident that the cause of action which is relied upon as affording a basis for the relief sought is bottomed on the alleged contract made in 1911, in which a division of the property of Dennis Brothers was effected. In view of the questions raised with respect to the competency of the witnesses upon whose testimony the contract finds its sole support in the evidence, it is important to first determine the character of the contract with reference to the parties to it. The first contract, made in 1880, it may be assumed, was pleaded by way of inducement merely. That contract according to the averments of the petition was one of employment wherein Dennis Brothers, in consideration of certain services to be rendered by Rachel, agreed that she should have a one-third interest in all the property they then owned or might thereafter acquire. The evidence, however, tends to show an agreement under which Rachel cast her lot with her brothers, they giving her an equal interest in what they then had, and the three of them agreeing that from that time on they would work together and share alike—on the face of it a partnership pure and

Contract:
Character:
Partnership:
Trust.

simple.   Pursuant to that agreement they worked to-
gether for a period of twenty years and accumulated the
property giving rise to this controversy.

Touching the contract of 1911 the petition alleged
that certain property was conveyed and transferred to
Davis Dennis upon his agreement, ''and the said agree-
ment and promise of the said firm with the said plain-
tiff,'' that he would hold the property in trust for himself
and plaintiff, jointly and in equal parts.   It is obvious
that if such a promise were made by ''the firm,'' wheth-
er the firm consisted merely of the two brothers, or of
them and the sister, it was entirely beyond the scope of
the partnership.   It was no concern of the partnership
what division or disposition was made of its assets at-
tendant upon its dissolution or after it had become non-
existent.   The very fact that the partners undertook a
division of the assets necessarily implied that the part-
nership had previously terminated.   After dissolution
a division of the assets among partners is a matter that
devolves upon them individually.   While Austin and
Davis could have joined in a promise to Rachel with re-
spect to the division, it would have been in their individ-
ual capacities and not as a ''firm.''

In their argument in support of their contention as
to the relations sustained by the several parties to the
contract of 1911, respondents seem to assume that the
firm of Dennis Brothers, consisting of the two brothers,
for the purpose of settling with Rachel for her services
and discharging its contractual obligation in that respect,
agreed with her that it would deliver a certain proportion
of the partnership property to Davis Dennis to be held
by him in trust for her.   This view implies that there
were but two parties to the contract, the two brothers on
one side and Rachel on the other, and that so far as they
were concerned the contract remained 'executory until
they delivered the property in 1911 in performance.   And
the further deduction would follow, that until they made
the delivery the property was theirs.   It is obvious that
respondents' case would not prosper on this theory, be-

cause if the firm conveyed lands to Davis Dennis upon an alleged trust, such trust would have to be manifested or proved by some writing signed by him.  [Sec. 2263, R. S. 1919.]  What is of more importance, however, is that such hypothesis is without support in the evidence. Giving to the testimony of Austin Dennis and Rachel Dennis full effect according to its import, the contract of 1880 invested Rachel not only with a present **Witnesses: Competency.** interest equal to that of her brothers in the property of Dennis Brothers, but also with the right to participate equally with them in the future earnings of the co-partnership. Whether the contract be deemed to have made her a partner on an equal footing with them, or merely to have provided a compensation for her services, is immaterial.  Under any possible construction she became a co-owner of the property of Dennis Brothers in 1880 and continued so to be up to the time of the alleged division in 1911.  And according to the testimony of Austin and Rachel she was so regarded by all parties when the property was partitioned —a one-third interest for her and a one-third for Davis being set off together.  It seems to be beyong question, therefore, that the alleged contract under which the partition was effected was a three-party contract.  If the testimony just referred to be accepted as true, it was negotiated and executed by and between Austin and Davis and subsequently ratified by Rachel.

There was evidence in the case outside of the testimony of the witnesses whose competency was challenged which showed conclusively that Austin Dennis and Davis Dennis by mutual consent terminated their partnership in 1911 and divided their assets.  That fact was conceded. But whether in that division Davis received two-thirds of the property, one-third for himself and one for Rachel, was the matter in issue and on trial.  Davis Dennis, one of the original parties to the alleged contract, was dead. Were Austin Dennis and Rachel Dennis each "the other party to the contract" within the meaning of Section 5410, Revised Statutes 1919?  Davis was not a co-con-

tractor with either of the other two, nor were they co-
contractors with each other.  For the purpose of such
contract there was no community of interest.  In making
the division the interest of each of the three was separate,
distinct and adverse to the claims respectively of the
other two.  Each therefore contracted for himself with
each of the others.  If the contract was made as alleged,
Davis at the time agreed with Austin that he was re-
ceiving two-thirds, that is, two shares, of the joint prop-
erty, and he agreed with Rachel not only that he was re-
ceiving two shares but that one of them was hers.  Rachel
on her part in effect agreed with Austin that two full
aliquot parts had been set off to her and Davis jointly,
and that in consideration thereof she relinquished all
claims to the remainder which had been allotted to him.
But while the promises were several and mutually de-
pendent, the contract in its entirety was but one transac-
tion.  So far as Rachel, the plaintiff, is concerned there
can be no question but that she was incompetent to testify
as to the terms of the contract because it constituted the
foundation of her cause of action.  It would seem equally
clear that Austin was likewise disqualified, by both the
letter and the spirit of the statute.  He was an original
party to the alleged contract and the other party was
dead; he was as vitally interested in effecting its estab-
lishment as was the plaintiff in the case, for thereby he
would relieve himself and his property of all claims on
her part at the expense of his brother's estate.

   This further interpretation of the statute is in con-
sonance with the principles heretofore announced in many
cases, among them:  Banking House v. Rood, 132 Mo.
256; Weiermueller v. Scullin, 203 Mo. 466; Griffin v.
Nicholas, 224 Mo. 275, 327; Edmonds v. Scharff, 279 Mo.
78.

   II.  A witness for plaintiff, John Elgin, testified to
a conversation which he said occurred between Davis
Dennis and his father and in which the former stated
that in the division of the property Austin had gotten

**Nullified Evidence.** one-third and he and Rachel two-thirds. Mrs. Elgin, his mother, also testified to a conversation of like tenor which she said took place between Davis and her husband. Both of these witnesses, however, admitted on cross-examination that Elgin, Sr., died in 1910 nearly a year before the property of Dennis Brothers was divided. These admissions completely nullified their testimony so far as its evidentiary value was concerned.

After eliminating the testimony of the Elgins and that of Austin and Rachel Dennis, so far as it relates to the alleged contract of 1911, what is there left in the way of evidence tending to support the allegations of the petition with respect to such contract? It can be **Insufficient Proof.** briefly summarized: (1) The testimony of Austin and Rachel that Dennis Brothers in 1880 agreed with Rachel, that if she would keep house for them and render such services as were incidental thereto, they would share equally with her in what they then had and in what they thereafter acquired; (2) the testimony of Walter A. Dennis that Davis Dennis ratified a statement made in 1911 by the witness's father to his mother that the deed which the latter two were then executing to Davis "was for Davis P. Dennis and Rachel Dennis also;" and (3) the testimony of Ivy May Druell as to a conversation between Davis and Rachel, in which the latter stated, after being told that the property had been divided, that she was glad of it and wanted her part, and he replied, you will get that at my death.

Looking to the evidence as a whole and in the light of what the parties did, it is reasonably certain that Rachel Dennis was given to understand by her two brothers that she would either share in some measure in the property they accumulated, or be otherwise rewarded for her part of the labor incident to its acquisition. But the idea that she was to share equally with them and be in fact a co-owner is utterly at variance with the acts and conduct of each of the three during the lifetime of Davis. For twenty years the two brothers conducted

their farming operations in their own names and, so far as the evidence discloses, without once consulting or advising with their sister. At the end of the period they dissolved the partnership and divided the property between themselves, wholly ignoring her as a party having a legal interest. However, in the making of the division she apparently came in for some consideration, but if so, she was regarded, in relation to her brothers and their property, as a ward or dependent rather than as one having an absolute right. Rachel herself never claimed an equal share in the property or any other definite interest. When informed that the division had been made she said she wanted her part. She was told by Davis that she would get that at his death, and that promise apparently satisfied her. After his death, considering the provision made for her in his will inadequate, she went with Austin to consult an eminent member of the Saline County Bar. After the conference with the two the attorney prepared a claim against the estate of Davis Dennis for services rendered and directed her to make affidavit to it before the judge of the probate court and then return it to him, which she did. Shortly afterward and before anything further was done the attorney died. Subsequently this suit was instituted by other counsel. Had not death intervened the suit here would no doubt have been one on *quantum meruit* for services rendered instead of one seeking to establish a trust in one-half of the estate of the deceased brother.

As already suggested, there was evidence tending to show that Austin and Davis, at the time they divided their property, recognized that an obligation of some kind rested upon them with respect to Rachel. In the light of what they did, it is manifest that they thought that that obligation was to support her and make suitable provision for her in case she survived them. Such obligation Davis evidently took upon himself. In the division he got property to the extent of approximately four thousand dollars in value in excess of that received by Austin. A short time before his death he invested this amount

and a little more in Government bonds for. Rachel; he continued to support her and to provide her with a home, and in his will he bequeathed her one thousand dollars. These provisions, all the circumstances considered, were so meager that they prompt the feeling that a gross injustice was done Rachel. At the time of Davis's death, however, his sister was seventy-two years old, and he may have thought, as the fact afterward proved to be, that the means he had provided for her support during the remainder of her life would be ample for that purpose. In any event the disposition of the case cannot be controlled by any views we may entertain with respect to the generosity or justness with which the two brothers treated their sister. The question here is whether the contract pleaded was established by the character and *quantum* of proof required in cases of this kind, and we find that it was not. It follows that the judgment of the trial court must be reversed. It is so ordered. All concur.